RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 17a0157p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

RICHARD WESLEY,

          *Plaintiff-Appellee,*

      *v.*

ALISON CAMPBELL, et al.,

          *Defendants,*

JOANNE RIGNEY,

          *Defendant-Appellant.*

No. 16-5431

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 2:10-cv-00051—David L. Bunning, District Judge.

Decided and Filed:  July 20, 2017

Before:  DAUGHTREY, CLAY, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:**  Jeffrey C. Mando, ADAMS, STEPNER, WOLTERMANN & DUSING, PLLC, Covington, Kentucky, for Appellant.  Paul J. Hill, Covington, Kentucky, for Appellee.

_____

## OPINION

_____

MARTHA CRAIG DAUGHTREY, Circuit Judge.  We previously addressed aspects of this civil rights case in *Wesley v. Campbell*, 779 F.3d 421 (6th Cir. 2015) (*Wesley II*).  In *Wesley II*, plaintiff Richard Wesley appealed an adverse decision by the district court in the lawsuit he brought against Joanne Rigney, an officer with the Covington Police Department.

Wesley had claimed that Rigney was liable under 42 U.S.C. § 1983 for arresting him without probable cause. The district court, concluding that probable cause existed for the arrest and that Rigney was qualifiedly immune, granted Rigney's motion to dismiss the claim. *Wesley v. Rigney*, 913 F. Supp. 2d 313, 321 (E.D. Ky. 2012) (*Wesley I*). We reversed that decision and remanded to the district court, where the case proceeded to trial. After a jury determined that Rigney did arrest Wesley unlawfully, Rigney filed a renewed motion for a directed verdict and a motion to alter, amend, or vacate the judgment for a new trial. The district court denied both motions. *Wesley v. Rigney*, No. 10-51-DLB-JGW, 2016 WL 853505, at *14 (E.D. Ky. Mar. 3, 2016) (*Wesley III*).

On appeal, Rigney challenges the district court's denial of her motion for a directed verdict on both the false-arrest claim and her entitlement to qualified immunity. Further, she challenges the district court's denial of her motion for a new trial based on the district court's failure to instruct the jury adequately about the issue of qualified immunity, and the district court's reference to J.S.'s psychological history during the probable-cause jury instruction. Finally, Rigney contends that the district court erred in denying her motion for a directed verdict regarding the availability of punitive damages and in refusing to remit both the punitive and compensatory damage awards. We find no reversible error and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

At trial, the proof established that Wesley was a counselor and intervention specialist at Sixth District Elementary School in Covington, Kentucky. In this position, Wesley periodically counseled a seven-year-old boy, "J.S.," who suffered from psychological and behavioral problems. On February 5, 2009, Wesley was notified that J.S. was attempting to harm himself in the hallway. Wesley brought J.S. into his office, where J.S. waited with two other students while Wesley called J.S.'s mother and notified her that J.S. needed to be taken to NorthKey Community Care, a local mental health center. Wesley's office was located directly next to the principal's office, in the school's administrative hub. Peri Fischer, an administer who sat often at the desk directly across from Wesley's office, testified that Wesley was alone with J.S. only for a few minutes before J.S.'s mother came to pick him up, that Wesley's office door was fully open

the entire time he was alone with J.S., and that she was able to observe J.S. and Wesley the entire time they were alone together.

J.S.'s mother picked him up from school, and the two took a cab to NorthKey. On the way, apparently J.S. told his mother that Wesley had sexually assaulted him in his office earlier that day. In response to these allegations, Alison Campbell, a social worker, came to NorthKey to talk to J.S. J.S. told Campbell that he was in Wesley's office earlier that day with two other children, but that after the other children left, Wesley closed the door further—but still left it open a crack—and then touched J.S.'s "private part" over the top of J.S.'s clothes. J.S. reported that both he and Wesley had their clothes on during this incident, and that Wesley told him not to tell anyone. Based on this allegation, Campbell contacted Joanne Rigney, a detective in the Covington Police Department. At some point shortly after the initial allegations, J.S.'s mother called the Covington Police Department and told an officer a version of events that involved Wesley taking J.S.'s penis out of his pants. J.S. also was interviewed by the Children's Advocacy Center regarding the alleged sexual abuse. At this interview, J.S. testified that Wesley had sodomized him multiple times throughout the year. He also reported that Wesley had sexually abused two other students at the school.

After the Advocacy Center interview, Rigney and Campbell coordinated interviews of 32 other students who had contact with Wesley. None of these children disclosed any inappropriate behavior by Wesley. Despite visiting the school, Rigney did not interview the employees who worked near Wesley's office about the sexual abuse that allegedly had occurred in Wesley's office, while the door was ajar. Rigney arranged for J.S. to be medically examined for any physical signs of trauma from the alleged rape. The exam did not reveal any evidence of abuse.

On April 27, 84 days after J.S.'s first allegation against Wesley, Rigney sought a warrant for Wesley's arrest. Prior to submitting the application for the arrest warrant, Rigney testified that she discussed the facts of the case with Stephanie Durstock, an assistant Kenton County Commonwealth attorney. Durstock reviewed and approved Rigney's draft affidavit, which stated the following:

> Affiant states that on February 06, 2009, she was assigned to investigate a Sexual Abuse in the First Degree report. Affiant states that she was contacted by the Cabinet for Health and Family Services in regard to a disclosure that was made by the minor victim J.S., age 7, on February 05, 2009. At that time, J.S. stated that the defendant had fondled his penis while in the defendants [sic] office at 6th District School. The defendant is employed as a school counselor at 6th District School. The minor, J.S., was then scheduled for a forensic interview at the Children's Advocacy Center, at that time the child stated that the defendant had put his private part in his butt. J.S. stated that this took place in Mr. Wesley's office. J.S. described that the defendant pulled down the back of his pants while he was near a blue round table. J.S. also advised that the defendant was squeezing J.S.'s private part. J.S. stated that he was told by the defendant that he would kick him out of school if he told anyone. J.S. stated that this happened more than once.

A state magistrate, concluding that there was probable cause to arrest Wesley, issued a warrant for Wesley's arrest. The charges ultimately were dismissed.

After four days of testimony, the jury found that Wesley had proven by a preponderance of the evidence (1) that Rigney lacked probable cause to secure a warrant for his arrest; (2) that the facts misrepresented in or omitted from Rigney's affidavit and warrant application were material; and (3) that the misrepresentation or omission of material facts was done intentionally, deliberately, or with a reckless disregard for the truth. The jury awarded Wesley $589,000 in compensatory damages, and $500,000 in punitive damages.

## DISCUSSION

**False-Arrest Claim**

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010) (citation and internal quotation marks omitted). Rigney argues that the district court erred in denying her motion for a directed verdict as to Wesley's false-arrest claim because she had probable cause to arrest Wesley, and because she is entitled to qualified immunity. "Qualified immunity protects public officials from liability for civil damages if their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). We review the district court's

denial of a motion for judgment as a matter of law *de novo*.  *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1078 (6th Cir. 1999).  "Judgment as a matter of law is appropriate only when there is a complete absence of fact to support the verdict, so that no reasonable juror could have found for the nonmoving party." *Id.*  We review the evidence in the light most favorable to the non-moving party, and "we cannot weigh the credibility of witnesses and cannot substitute our judgment for that of the jury." *United States v. Alpine Indus., Inc.*, 352 F.3d 1017, 1022 (6th Cir. 2003).

To determine whether Rigney is entitled to qualified immunity, we must determine whether the facts within the trial record make out a violation of a constitutional right, and whether that right was clearly established "such that a reasonable officer would have known that [her] conduct violated it." *Martin*, 712 F.3d at 957.  "These two steps may be addressed in any order." *Id.*  In *Wesley II*, we held that, based on the allegations in Wesley's complaint, it was plausible that Rigney was *not* entitled to qualified immunity.  *Wesley II*, 779 F.3d at 433.  "After trial, if defendants continue to urge qualified immunity, the decisive question, ordinarily, is whether the evidence favoring the party seeking relief is legally sufficient to overcome the defense." *Ortiz v. Jordan*, 562 U.S. 180, 184 (2011) (citing Fed. R. Civ. P. 50).

**Clearly Established Right**

As we previously explained in *Wesley II*, it is clearly established that individuals have the right to be free from arrest pursuant to a warrant that, but for deliberate or reckless omission of material facts, never would have been issued.  *Wesley II*, 779 F.3d at 428–29 ("[I]n the context of an officer's application for an arrest warrant . . . the officer violates clearly established law when he makes material *omissions* that are deliberate or show reckless disregard for the truth." (internal quotations marks and alterations omitted) (emphasis added).  This right was clearly established at the time of Wesley's arrest.  *See Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) ("Police officers cannot, in good faith, rely on a judicial determination of probable cause when that determination was premised on an officer's own material misrepresentations to the court.  Such reliance is unreasonable, and detention of an individual pursuant to such deceptive practices violates the Fourth Amendment.") (internal citation omitted); *Vakilian v. Shaw*, 335 F.3d 509, 517 (6th Cir. 2003) ("An investigator may be held

liable under § 1983 for making material false statements either knowingly or in reckless disregard for the truth to establish probable cause for an arrest."). Because the law is clearly established, a reasonable officer would be aware that a deliberate or reckless omission of material facts from an arrest warrant violates the constitutional rights of the accused.

**Constitutional Violation**

Viewing the trial record in the light most favorable to Wesley, the non-moving party, we next review whether it was reasonable for the jury to determine that such a constitutional violation did, in fact, occur. In reaching this verdict, the jury decided that Rigney did not have probable cause to arrest Wesley. Additionally, the jury found that Rigney deliberately, or with reckless disregard for the truth, omitted material information from her affidavit accompanying the arrest warrant, therefore establishing that Rigney was not qualifiedly immune.

An officer has probable cause to make an arrest when "the facts and circumstances within [her] knowledge and of which [she] had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the petitioner had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Because both "inculpatory *and* exculpatory evidence" must be taken into account when deciding if probable cause exists, *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) (emphasis in original), officers cannot ignore known exculpatory evidence when making a probable cause determination. *See, e.g.*, *Ahlers v. Schebil*, 188 F.3d 365, 372 (6th Cir. 1999) ("[O]fficers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone.").

The affidavit Rigney submitted to support her application for an arrest warrant relied upon J.S.'s allegations against Wesley. In *Wesley II*, we explained that:

> Probable cause is created only by eyewitness allegations that are *reasonably trustworthy*, and thus probable cause does *not* exist where there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection.

*Wesley II*, 779 F.3d at 429–430 (internal quotations and citations omitted) (emphasis in original). We further explained that several of the facts alleged in Wesley's complaint allowed a fact-finder to question J.S.'s reliability. *Id.* at 430. Accepting the allegations in Wesley's complaint as true, as is required when reviewing a Rule 12(b)(6) motion, we determined that "J.S.'s uncorroborated allegations were legally insufficient to create probable cause." *Id.* at 429.

At trial, the jury heard testimony explaining why J.S.'s allegations were implausible due to the location of the office, the fact that J.S. stated that Wesley kept the door ajar, the fact that J.S. said that both he and Wesley were standing up during the alleged sodomy, and the fact that J.S. said he had seen his family outside the window during one of the alleged acts of sodomy. Further, the jury listened to testimony about J.S.'s psychological history and negative medical exam, and the jury learned about Rigney's unsuccessful attempts to corroborate J.S.'s allegations. Critically, the plaintiff also presented evidence that Rigney was aware of this information but did not disclose it in her affidavit supporting the application for an arrest warrant. Considering this evidence, and our detailed opinion in *Wesley II*, it was reasonable for the jury to conclude that J.S.'s allegations were unreliable, that Rigney knew they were unreliable and, therefore, that Rigney did not have probable cause to make the arrest.

It was also reasonable for the jury to find that the information Rigney omitted from her affidavit was material and that Wesley's omissions were deliberate or made in reckless disregard for the truth. In *Wesley II*, considering only the allegations in Wesley's complaint, we stated:

> [I]t seems clear that Rigney's decision to withhold evidence of J.S.'s unreliability was material, because it is clearly established that witness allegations fail to sustain probable cause when there is apparent reason to question the person's reliability. If the magistrate who issued the arrest warrant had known that there were, in fact, several apparent reasons to question J.S.'s reliability, precedent would have precluded a finding of probable cause, and the warrant would not have issued.
>
> In addition, Rigney's omissions demonstrate deliberateness or a reckless disregard for the truth, given that any reasonable officer would have recognized the importance of J.S.'s reliability on the question of probable cause. Put another way, any reasonable officer would have known that the gaps in J.S.'s credibility would be the kind of thing the judge would wish to know.

*Wesley II*, 779 F.3d at 433 (internal citations and quotation marks omitted). The jury was presented with ample evidence at trial to allow them to find that J.S.'s allegations were unreliable. Because evidence of this unreliability was not included within Rigney's affidavit, a reasonable juror could find that Rigney omitted material information and, in doing so, exhibited deliberate or reckless disregard for the truth.

Rigney argues that it was not unreasonable for her to conclude that probable cause did exist, because she had discussed the case and the affidavit with Durstock, the county attorney, prior to submitting the application for the warrant. At trial, Rigney testified that she did not withhold any information about the case and investigation from Durstock, and Durstock nevertheless signed off on the affidavit. Durstock, however, testified that she was uncertain whether and when Rigney had told her that J.S. had claimed that two other children had been abused, that she was unsure whether Rigney had shown her the pictures from the school before or after applying for the warrant, and that she did not think she was informed that J.S. had reported that Wesley's pants were off during the sodomy.

Further, Durstock did not watch J.S.'s Advocacy Center interview until after Wesley's arrest. Durstock testified that after watching the interview and then speaking with J.S. for only two or three minutes, she decided that the case was not worth pursuing. Durstock claimed that her decision was not based on J.S.'s credibility or the existence of probable cause for the arrest but because J.S. and his mother were uncooperative. However, based on the severity of the charges and the fact that Durstock only gave J.S. two or three minutes of time before reaching this decision, a reasonable juror could conclude that Durstock did not, in fact, believe that J.S.'s allegations were credible and, furthermore, that Rigney had not disclosed all of the exculpatory evidence to Durstock prior to applying for the arrest warrant. The jury evaluated this testimony and determined its credibility, which was clearly within its purview.

Judgment as a matter of law is inappropriate in light of such findings of fact. Considering that the jury's reasonable findings of a lack of probable cause, of the materiality of omitted information, and of Rigney's reckless or deliberate disregard for the truth, the district court did not err in denying Rigney's motion for a directed verdict regarding the false arrest claim and the claim for qualified immunity.

**Jury Instructions**

Rigney's motion to alter, amend, or vacate for a new trial under Rule 59 of the Federal Rules of Civil Procedure alleged deficiencies in the jury instructions. "'A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law.'" *Miami Valley Fair Hous. Ctr., Inc. v. Connor Grp.*, 725 F.3d 571, 579 (6th Cir. 2013) (quoting *Jones v. Federated Fin. Reserve Corp.*, 144 F.3d 961, 966 (6th Cir.1998)). We review a district court's decision to deny a motion for a new trial under an abuse-of-discretion standard. *Holmes v. City of Massillon*, 78 F.3d 1041, 1045 (6th Cir. 1996).

### Qualified-Immunity Instruction

First, Rigney contends that the district court did not provide adequate instructions on the defense of qualified immunity. Specifically, Rigney proposed that the jury be instructed that "[i]f you find that Officer Rigney could have reasonably believed that probable cause existed based on the content of her warrant application, then you will find in her favor on the unlawful arrest claim." She also proposed the following special verdict: "Considering Instructions 6 and 7, do you find that Officer Rigney could have reasonably believed she had probable cause to apply for a warrant for Mr. Wesley's arrest?" The district court denied both proposed instructions.

The district court did not abuse its discretion in denying Rigney's motion for a new trial based on the omission of this jury instruction, because qualified immunity is a question of law to be determined by the judge. *Pouillon v. City of Owosso*, 206 F.3d 711, 718 (6th Cir. 2000). "Questions of fact may be relevant to this determination, but the ultimate question is one of law: if the finder of fact determines that the officers undertook certain actions, could any reasonable police officer have believed that those actions did not violate [the plaintiff's] constitutional rights?" *Id.* (internal citation omitted). Further, Rigney's proposed instructions are inconsistent with the objective nature of the qualified immunity analysis. *See Crawford-El v. Britton*, 523 U.S. 574, 588 (1998) ("Evidence concerning the defendant's subjective intent is simply irrelevant to [the qualified immunity] defense.")

**Psychological-History Instruction**

Rigney also contends that the district court erred "by instructing the jury to consider J.S.'s history of psychological problems when determining his reliability." Rigney mischaracterizes the district court's jury instructions. The district court instructed the jury that "[i]n determining whether there was an apparent reason for Officer Rigney to question J.S.'s reliability, you may consider information Officer Rigney knew about the following factors," including J.S.'s age, the plausibility and consistency of his allegations, his history of psychological problems, the results of any medical exams, and whether there was any corroborating evidence for his allegations.

According to Rigney, this instruction was misleading and prejudicial because "all of the witnesses who testified on the issue . . . said that J.S.'s history of psychological issues did not make him any less credible as a witness." As the district court explained:

> [T]he jury was not bound to believe or credit the testimony of these witnesses. When testimony is inherently contrary or attended by some circumstance that would render a jury disregarding it reasonable, the jury may be free to disregard it. J.S.'s reliability was undoubtedly an important part of the jury trial, and the importance of his psychological problems was very much at issue. Moreover, when the Sixth Circuit remanded this case for trial, the panel stated that J.S.'s history of psychological disturbances as [sic] a factor affecting his reliability.

*Wesley III*, 2016 WL 853505, at *8 (internal citation omitted). We emphasized in *Wesley II* that "J.S.'s history of psychological problems supported an inference that he was a less reliable witness than a psychologically healthy child." *Wesley II*, 779 F.3d at 432. It was not an abuse of discretion for the district court to consider this guidance and instruct the jury accordingly.

**Punitive Damages**

**Motion for Directed Verdict**

Rigney also contends that the trial court erred in denying Rigney's motion for a directed verdict on the issue of punitive damages. "Punitive damages are appropriate in a § 1983 action 'when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'" *King v.*

*Zamiara*, 788 F.3d 207, 216 (6th Cir. 2015) (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)). "The allowance of such damages involves an evaluation of the nature of the conduct in question, the wisdom of some form of pecuniary punishment, and the advisability of a deterrent." *Gordon v. Norman*, 788 F.2d 1194, 1199 (6th Cir. 1986).

Rigney argues that no reasonable juror could have found a basis for awarding punitive damages. But, after determining that Wesley *did* present sufficient evidence to support a finding that Rigney omitted material evidence from her affidavit with deliberate or reckless disregard for the truth, this argument is a difficult one to make. In addition to the exculpatory evidence discussed previously, the jury heard testimony that would allow them to conclude that Rigney's investigation was less than thorough—and, because probable cause had *not* been established by J.S.'s allegations alone, Rigney's duty to investigate was never discharged. *See Ahlers*, 188 F.3d at 371 ("Once probable cause is established, an officer is under no duty to investigate further or to look for additional evidence which may exculpate the accused."). As the district court aptly summarized:

> During the trial, Wesley presented a considerable amount of evidence to suggest that [Rigney's] actions were reckless as to his Fourth Amendment rights. First, there was the eighty-four day period between the initial abuse disclosure and arrest, the bulk of which was not spent investigating Wesley. Next, there was the lack of corroborating evidence and the inconsistent statements by J.S. Additionally, [Rigney] failed to interview other school officials and employees who worked near Wesley's office. Finally, [Rigney's] omissions from her arrest warrant application and her testimony that it was her job to believe the child further support a finding of recklessness.

*Wesley III*, 2016 WL 853505, at *6. Because a reasonable juror could find that Rigney's conduct involved reckless or callous indifference to Wesley's federally protected rights, the district court did not err in denying Rigney's motion for a directed verdict regarding the availability of punitive damages.

**Motion for Remittitur of Punitive-Damages Award**

Alternately, Rigney contends that the district court erred in refusing to remit the punitive damages award, which she believes is unconstitutionally excessive. We review the constitutionality of a punitive-damages award *de novo*. *Arnold v. Wilder*, 657 F.3d 353, 369 (6th

Cir. 2011).  To determine "[w]hether a punitive damages award is so excessive as to offend due process," we consider three guideposts: "the degree of reprehensibility of the defendant's conduct, the punitive award's ratio to the compensatory award, and sanctions for comparable misconduct."  *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 643 (6th Cir. 2005) (citing *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 576–84 (1996)).

Of the three factors, the reprehensibility of a defendant's conduct best indicates the reasonableness of a punitive damages award.  *Romanski*, 428 F.3d at 643.  In determining the degree of reprehensibility, we consider whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003).  The absence of all of these factors renders an award suspect.  *See Romanski*, 428 F.3d at 643.

The jury heard that on the day of Wesley's arrest, police officers blocked off the street and surrounded his house.  He was handcuffed in the middle of the street, within view of his neighbors.  Upon arriving at jail, he was strip-searched and placed in a cell with an overflowing toilet and dried blood on the walls.  One jailer told Wesley that "this is what people like you deserve," and Wesley was warned to not disclose his sexual-assault charges to other detainees, because it wouldn't "go over good in here."  Wesley was arrested in late April, but the charges against him were not dismissed until mid-August, meaning that Wesley suffered from the fear and uncertainty associated with these charges for over three months.  Wesley ultimately was diagnosed with Post Traumatic Stress Disorder (PTSD).  Notes from Wesley's therapist reported that after the arrest, Wesley was "angry, depressed, and [irritable]," that he "does experience dreams of horror in which his whole life is taken away from him," and that "he experiences some symptoms of PTSD because he is so hypervigilant around children, fearing someone will misinterpret the least questionable behavior."  At trial, Wesley said, "If I'm out in public, if there's a kid that comes around, I'm startled.  I have to remove myself.  I feel like I've been ostracized my own self for something that I never did, for something I never, never, never did."

In *Romanski*, we found that an elderly woman detained by casino security guards suffered "physical" harm, in that she felt "sick, embarrassed, humiliated, intimidated, and scared." *Romanski*, 428 F.3d at 643-44.  We explained that "[a]lthough she did not suffer actual physical injury, the jury could reasonably infer from the peculiar circumstances of Romanski's detention and questioning—a process initiated on the casino floor in front of patrons by a team of four security personnel—that the threat of physical force was apparent." *Id.*  Wesley experienced significant economic harm as a result of his arrest, but much of the harm he experienced is better categorized as physical.  Like Romanski, Wesley felt humiliated and scared during his arrest and detention, and the threat of physical force also was apparent.  Additionally, Wesley suffered lasting mental and emotional harm that is far more analogous to physical than economic harm for purposes of this analysis.

As in *Romanski*, "[m]ore important than the harm [the plaintiff] suffered, that harm being of such a type that the label 'physical' rather than 'economic' befits it, is the fundamental nature of Defendant['s] conduct in this case."  *Id.* at 644.  "[A] defendant's conduct can be highly reprehensible without being actually violent."  *Id.* (citing *Lee v. Edwards,* 101 F.3d 805, 810 (2d Cir. 1996)).  Any unlawful arrest is abhorrent, but the severity and stigma associated with the charge of sexually abusing a seven-year-old child—particularly when one's career has been devoted to counseling children—made this unlawful arrest exceedingly reprehensible.  Rigney's actions evinced a clear indifference to or reckless disregard for Wesley's health and safety, as the impact of this type of arrest on a person's mental health is far from unforeseeable.  Regardless of whether this conduct was an isolated incident or was the result of "intentional malice, trickery, or deceit," the reprehensibility of Rigney's conduct warrants the awarded amount of punitive damages.

The ratio between the punitive damages and the compensatory damages awarded further supports the constitutionality of this award.  Generally, the ratio between punitive and compensatory damages should be limited to "single-digit" ratios, meaning no more than 9:1.  *See State Farm*, 538 U.S. at 425 ("Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with rations in range of 500 to 1.").  However, because Wesley was awarded substantial

compensatory damages, "a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* The punitive damages awarded in this case are *lower* than the compensatory damages and, therefore, the ratio here does not violate due process.

The third and final guidepost requires us to consider the amount of sanctions awarded for similar violations. The purpose of this inquiry is to determine whether Rigney had fair notice that her conduct might result in penalties or punitive damages in the range of $500,000. *Romanski*, 428 F.3d at 648. In *Romanski*, the defendant was found guilty of false arrest after a 72-year old plaintiff was accused by casino security guards of stealing a token, escorted off the casino floor into a back room where she was interrogated by several security officers, and removed from the casino and forced to wait for her bus outside in the heat. We determined that a punitive damage award up to $600,000 was appropriate. *Id.* at 649–50. In *Arnold*, a police officer knocked the plaintiff to the ground, put her in a chokehold, dragged her into his car, and then sprayed her with pepper spray. 657 F.3d at 359. The police officer subsequently was found guilty of false arrest and malicious prosecution, and we determined that the plaintiff should be awarded $550,000 in punitive damages. *Id.* at 372. Although these cases involve very different factual situations, they provide sufficient support for the constitutionality of the amount of the punitive-damages award at issue here. Because none of the three guideposts indicates that the punitive damages award is unconstitutionally excessive, the district court did not err by refusing to remit the award.

**Compensatory Damages**

Rigney also challenges the district court's refusal to remit the jury's award of compensatory damages. "In the absence of undue passion and prejudice on the part of the jury, we review for abuse of discretion the district court's decision on the issue of remittitur." *Gregory v. Shelby Cty.*, 220 F.3d 433, 443 (6th Cir. 2000). We should not disturb a jury verdict "'unless it is beyond the maximum damages that the jury reasonably could find to be compensatory for a party's loss.'" *Id.* (quoting *Jackson v. City of Cookeville*, 31 F.3d 1354, 1358 (6th Cir. 1994)). An award for compensatory damages will stand unless it is: "(1) beyond the

range supportable by proof; or (2) so excessive as to shock the conscience; or (3) the result of a mistake." *Id.* (citing *Bickel v. Korean Air Lines Co., Ltd.*, 96 F.3d 151, 156 (6th Cir. 1996)).

The jury awarded Wesley compensatory damages for lost wages, past pain and suffering, and future pain and suffering. On appeal, Rigney disputes only the $132,000 awarded for lost wages. First, Rigney points out that Wesley's arrest occurred *after* he had been terminated from Sixth District, and second, that Wesley's position was going to be eliminated regardless of the incident due to lack of funding. The district court, however, addressed each of these arguments in his denial of the motion to remit, explaining:

> Despite the fact that Wesley's arrest occurred after his termination, the arrest for sexual abuse remained on his record until fall 2010. During this time, as the testimony of Lynda Jackson—former superintendent of Covington Independent Schools—demonstrated, it is extremely unlikely that any school would have interviewed him for a job. Additionally, Jackson testified that, because of the gap in his resume caused by the arrest, Wesley would have had several hurdles to overcome in getting an interview. The red flags caused by his false arrest, and the resulting unemployment period, were detrimental to Wesley's ability to be rehired in any position, but especially in one working with children. Further, even if Wesley was terminated from his position due to budgetary restrictions, which, given the circumstances, the jury would have been reasonable in considering suspect, Defendant's arrest still caused him sufficient harm to justify the jury's award.

*Wesley III*, 2016 WL 853505, at *12.

Wesley also testified about the impact of his PTSD on his employment opportunities. Despite his background and qualifications, he was unable—and is still unable—to perform any job requiring interaction with children, thus limiting his job search. The jury thus had reason to believe that Wesley's three-year period of unemployment was a direct result of his unlawful arrest and, therefore, the district court did not abuse its discretion in denying Rigney's motion to remit.

## CONCLUSION

For the reasons set out above, we AFFIRM the district court's judgment, both the denial of Rigney's motion for a directed verdict and the denial of Rigney's motion for new trial.