NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0581n.06

No. 19-1898

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

|  |  |  |
|---|---|---|
| JAMES LEE SALTMARSHALL, | ) | **FILED** |
| Plaintiff-Appellant, | ) | Oct 13, 2020 |
| | ) | DEBORAH S. HUNT, Clerk |
| v. | ) | |
| | ) | |
| PRIME HEALTHCARE SERVICES-GARDEN CITY LLC, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| Defendant, | ) | |
| | ) | |
| JEFFREY SMITH and JONATHAN MUNSON, | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

**BEFORE:** **DAUGHTREY, DONALD, and READLER, Circuit Judges.**

**CHAD A. READLER, Circuit Judge.** James Saltmarshall fell asleep with his eight-month-old daughter, Janiyah, in his arms. When he woke up, Janiyah was not breathing. Paramedics rushed Janiyah to the hospital, but, tragically, her life could not be saved.

In addition to losing a daughter, Saltmarshall faced even further tragedy. Rather than being allowed to be with his ailing daughter, he was arrested after a doctor noticed what she believed to be signs of sexual trauma on Janiyah's body. Saltmarshall spent the next week in jail, only hearing about his daughter's death at his arraignment. When Janiyah's autopsy later revealed no signs of sexual trauma or abuse, the charges against Saltmarshall were dropped.

Too hollow a vindication, Saltmarshall filed a 42 U.S.C. § 1983 suit against, among others, the officers who arrested and investigated the allegations against him. The district court granted summary judgment in favor of defendants and dismissed the suit. Because both the decision to arrest Saltmarshall and to prosecute him were supported by probable cause based on the officers' temporal knowledge, *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018), we must affirm.

## BACKGROUND

Every parent has had a day start like James Saltmarshall's. His eight-month-old daughter, Janiyah, was crying from an upset stomach and constipation. She needed to take a nap, but Saltmarshall had left her Pack n' Play at his father's house. And Saltmarshall's car would not start. Resigned, Saltmarshall changed Janiyah's diaper, made her bottle, and sat down on the bed to feed her. After she ate, Janiyah fell asleep. Saltmarshall turned on a movie, at which point he too fell asleep, albeit by accident, with Janiyah in his arms.

And every parent has prayed to never have a day end like Saltmarshall's. When he woke up, he noticed that Janiyah did not look quite right. Her head was limp, and she wasn't breathing. Saltmarshall frantically called 911. An ambulance and Inkster (Michigan) police officers were immediately dispatched. Lieutenant Jeffery Smith was one of the officers to respond. Saltmarshall explained to Smith what happened, and Smith surveyed the location. Janiyah was rushed to the hospital, with Saltmarshall and the officers shortly behind.

*Saltmarshall's Arrest.* Janiyah was in critical condition when she arrived at the ER. Saltmarshall explained to Dr. Shawna Wright, the attending ER physician, that he had been holding Janiyah, placed her on the bed, and then noticed she was not breathing. He did not explain to Wright that he had been sleeping with Janiyah. While examining Janiyah, Wright noticed signs

of trauma that seemed inconsistent with Saltmarshall's story, including a large rectal tear that was bleeding.

After evaluating Janiyah's condition, Wright expressed to Smith her concern for Janiyah's wellbeing. Wright told Smith that "Janiyah had injuries to her anus as well as a relatively large amount of rectal bleeding which could not be explained by the description of the incident given by [Saltmarshall]." Such an injury, Wright explained, may result from something being inserted into the rectum, telltale signs of child abuse. Wright in turn reported her suspicions of known or suspected child abuse to Children's Protective Services. And Smith, for his part, arrested Saltmarshall for suspected sexual assault of a minor. *See* MCL § 750.520b(1)(a).

*Investigation.* As more doctors examined Janiyah, the more severe the charges became. One doctor texted an update to one of the officers working Janiyah's case: "[B]aby has skull fractures, brain swelling on CT (likely will meet brain death criteria), lung bruising, anterior anal laceration. We have some other studies pending. This is non-accidental trauma. The perpetrator murdered this child." Another said that Janiyah had head trauma consistent with shaken baby syndrome, although the doctor did not see skull fractures or external head trauma.

Smith assigned Detective Jonathan Munson to investigate Saltmarshall's case. Munson spoke with Janiyah's doctors and reviewed messages they sent to the officers. He also interviewed Janiyah's mother, who told Munson that she did not believe Saltmarshall would hurt Janiyah. All the while, Saltmarshall sat in a jail cell, pleading with officers to believe that he did not assault his daughter. He spoke twice with Munson, each time tearfully explaining what happened. "My daughter was fine. We went to sleep. I wake up and she is dead because I suffocated her too much in the middle of my sleep;" "I held her too close. I just didn't want her to fall off the bed, man."

Munson asked Saltmarshall about Janiyah's other reported injuries—possible skull fracture, likely head trauma, and a seemingly large rectal tear. At first, Saltmarshall responded "[w]hat are the injuries? I'm lost." When Munson pushed Saltmarshall, he tried to explain possible reasons for two of the injuries. As he realized Janiyah wasn't breathing, Saltmarshall thought he might have shaken her to try and wake her. And when he was performing CPR, Saltmarshall was so hysterical that Janiyah slipped out of his hands, possibly hitting her head. Saltmarshall consistently denied any involvement in Janiyah's rectal injuries.

Munson detailed all of his findings in a warrant request. He did not make a recommendation in favor of or against prosecuting Saltmarshall. Munson submitted his request for a warrant to the Wayne County Prosecuting Attorney's Office. An assistant prosecuting attorney reviewed Munson's request, Janiyah's medical records, and Janiyah's Sexual Assault Forensic Examination (SAFE) report and decided to charge Saltmarshall with (1) felony murder, (2) first-degree criminal sexual assault, and (3) first-degree child abuse. At an arraignment hearing the following day, Saltmarshall learned the tragic news that Janiyah had died the day before. Based upon Smith's testimony and supporting evidence, a judge found sufficient probable cause to issue an arrest warrant.

*Saltmarshall's Release.* Later that day, medical examiners conducted an autopsy of Janiyah's body. The examiner expected to see trauma consistent with the examining doctors' reports—a large rectal tear, brain injuries from being shaken, and a possible skull fracture. But the autopsy indicated otherwise. The seemingly large rectal tear turned out to be a minute fissure, likely caused by Janiyah's constipation. The alleged skull fracture was just a small laceration. And Janiyah's body did not show signs of shaken baby syndrome. The autopsy report concluded

that Janiyah's death was likely caused by accidental asphyxiation from Saltmarshall holding Janiyah while they slept.

The prosecuting attorney immediately moved to release Saltmarshall from custody and dismiss all charges. All told, Saltmarshall was in jail for seven-and-a-half days. Seeking some recourse for his suffering, Saltmarshall initiated a 42 U.S.C. § 1983 suit against Smith, Munson, another police officer, the City of Inkster, both hospitals in charge of Janiyah's care, as well as doctors who examined her. The district court ultimately granted defendants' motions for summary judgment. This appeal followed.

## ANALYSIS

On appeal, Saltmarshall challenges only the summary judgment rulings as to Smith and Munson, and only as to the claims arising under both § 1983 and Michigan state law for (1) false arrest and false imprisonment and (2) malicious prosecution. We review the district court's grant of summary judgment with fresh eyes. *Newman v. Township of Hamburg*, 773 F.3d 769, 771 (6th Cir. 2014). Summary judgment is appropriate only when there is "no genuine dispute as to any material fact" and a party is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When determining whether a genuine dispute of material fact exists, we draw all reasonable inferences in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Our review also takes into account the qualified immunity defenses asserted by Smith and Munson. Qualified immunity shields law enforcement officers from civil liability unless the officers (1) violated a statutory or constitutional right and (2) the unlawfulness of their conduct was clearly established at the time. *Wesby*, 138 S. Ct. at 589. To overcome this defense, Saltmarshall must prevail on both prongs. *Howse v. Hodous*, 953 F.3d 402, 406 (6th Cir. 2020)

5

(citing *Maben v. Thelen*, 887 F.3d 252, 269 (6th Cir. 2018)).  Our analysis centers on the first prong: whether Smith or Munson violated Saltmarshall's constitutional rights.

*False Imprisonment.*  Saltmarshall asserts claims against Smith for false arrest and against Smith and Munson for false imprisonment.  Under both Michigan and federal law, however, false arrest is a subspecies of false imprisonment; an unlawful arrest is just one way to imprison someone.  *See, e.g.*, *Wallace v. Kato*, 549 U.S. 384, 388 (2007); *Peterson Novelties, Inc. v. City of Berkley*, 672 N.W.2d 351, 362 (Mich. Ct. App. 2003) (per curiam).  As such, we will treat them here as one and will refer to them as a claim for false imprisonment.

The sustainability of Saltmarshall's claim hinges on whether Smith had probable cause to arrest him.  *Sykes v. Anderson*, 625 F.3d 294, 305 (6th Cir. 2010); *Peterson Novelties*, 672 N.W.2d at 362; *Odom v. Wayne County*, 760 N.W.2d 217, 229 (Mich. 2008).   Under both Michigan and federal law, probable cause exists when the totality of the circumstances known to an officer at the time support the reasonable belief that a criminal offense has occurred or is ongoing.  *Jones v. City of Elyria*, 947 F.3d 905, 914 (6th Cir. 2020) (citing *Newman*, 773 F.3d at 772); *People v. Yost*, 659 N.W.2d 604, 607 (Mich. 2003).  A finding of probable cause necessarily defeats a wrongful imprisonment claim.  *See Seales v. City of Detroit*, 959 F.3d 235, 243 (6th Cir. 2020).

Probable cause "is not a high bar."  *Wesby*, 138 S. Ct. at 586 (quoting *Kaley v. United States*, 571 U.S. 320, 338 (2014)).  It is a "fluid concept" that looks to "the factual and practical considerations of everyday life" upon which reasonable people rely.  *Id.*; *Illinois v. Gates*, 462 U.S. 213, 231 (1983).  Probable cause requires only a likelihood or substantial chance of criminal conduct; it does not require an actual showing of that activity.  *Wesby*, 138 S. Ct. at 586; *see Wesley v. Campbell*, 864 F.3d 433, 438–39 (6th Cir. 2017).

Faced with the facts available to Smith at the time of Saltmarshall's arrest, a reasonable person could have similarly concluded that Saltmarshall likely committed a crime. When Smith responded to Saltmarshall's 911 call, he found an unresponsive, eight-month-old girl alone with her father. Both Saltmarshall and Janiyah's mother confirmed that Saltmarshall was the only person alone with Janiyah that day. When Smith arrived at the hospital, Janiyah's doctor told Smith that Janiyah had a large rectal tear that was still bleeding, an injury that could not be explained by Saltmarshall's version of events. As Wright told Smith, such an injury likely occurs from something being inserted into the rectum.

Smith had no reason to question the veracity or accuracy of Wright's statements. She was the attending physician with first-hand knowledge of Janiyah's condition and had no reason to lie or embellish. *See United States v. Jones*, 953 F.3d 433, 438–39 (6th Cir. 2020) ("Unless, at the time of the arrest, there is an apparent reason for an officer to believe an eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation, that accusation is sufficient to establish probable cause." (cleaned up)). And in Michigan, a person is guilty of first-degree criminal sexual conduct if he sexually penetrates a child under 13 years old. MCL § 750.520b(1)(a). Smith had (1) a doctor's eyewitness testimony describing Janiyah's injuries, (2) that doctor's suspicions about the cause of those injuries, and (3) the knowledge that the only person alone with Janiyah that day was Saltmarshall. Even Saltmarshall acknowledged: "I see how it can look. I'm a dude and this is my daughter and there's plenty of cases where dudes have molested their child or did something like that—that's not me at all." The totality of these temporal circumstances thus supports the conclusion that probable cause existed for Saltmarshall's arrest.

Of course, Saltmarshall ultimately was proven innocent. But that does not negate a finding of probable cause. Probable cause exists when officers reasonably and in good faith rely on incorrect information, including instances of mistaken identity, *Seales*, 959 F.3d at 240, victim statements that were later recanted, *Cleary v. County of Macomb*, 409 F. App'x 890, 907 (6th Cir. 2011), and when the facts or law upon which an officer reasonably relied turned out to be false, *Heien v. North Carolina*, 574 U.S. 54, 60 (2014). And we have upheld probable cause findings where an innocent person sat in jail for longer than Saltmarshall. *See, e.g.*, *Seales v. City of Detroit*, 724 F. App'x 356, 360 (6th Cir. 2018) (14 days); *Sinclair v. Lauderdale County*, 652 F. App'x 429, 438 (6th Cir. 2016) (37 days).

Saltmarshall counters that Smith did not consider exculpatory evidence nor conduct a full investigation before arresting him. For instance, Smith saw nothing in Saltmarshall's habitation suggesting that Saltmarshall sexually harmed Janiyah. And Saltmarshall told Smith that he had been sleeping with Janiyah, which, Saltmarshall claims, should have "militate[d] more in favor of other causes." Saltmarshall suggests that Smith should have also questioned Wright's suspicions because she did not know Saltmarshall and Janiyah had fallen asleep together in a bed. But these arguments assume that Smith did not take these facts into consideration. To the contrary, Smith explained that no initial indicators suggested that Saltmarshall intentionally harmed Janiyah. But Saltmarshall could not explain Janiyah's rectal tear, and Smith had no reason at the time to question Wright's assessment of Janiyah's injuries.

Saltmarshall's citation to *Gardenhire v. Schubert* does not lead us to a different conclusion. 205 F.3d 303 (6th Cir. 2000). It merely stands for the proposition that when an officer makes a probable cause determination, that officer should consider all relevant evidence (including exculpatory evidence) and must investigate further if the evidence does not show probable

cause. *Id.* at 318 ("[T]his Court is not adding a duty to investigate as a factor for establishment of probable cause . . . . Rather, the officer must consider the totality of the circumstances . . . ."). Although the information Smith received turned out to have been wrong, at the relevant time that evidence indicated probable cause to arrest Saltmarshall.

Saltmarshall attempts to distinguish between his arrest—for which only Smith was present—and his continued detention through dismissal of his charges—in which both Smith and Munson played a part. But probable cause to arrest includes the ability to detain thereafter. *See S.L. ex rel. K.L. v. Pierce Twp. Bd. of Trustees*, 771 F.3d 956, 962 (6th Cir. 2014); *Rayfield v. City of Grand Rapids*, 768 F. App'x 495, 507 (6th Cir. 2019). To the extent Saltmarshall argues that Smith and Munson unreasonably detained him after he was released from jail but until the charges against him were dropped, he is mistaken here as well. A person is "seized" only when officials "restrain his freedom of movement" so that he is "not free to leave." *Brendlin v. California*, 551 U.S. 249, 254 (2007). This claim therefore fails as well.

Even so, says Saltmarshall, his detention was "*per se* unreasonable," because he did not have a probable cause hearing within 48 hours of his arrest. Saltmarshall's assertion regarding a delay in his hearing overlooks Saltmarshall's own delay in raising the point. He did not raise it at any time before the district court, which typically would mean he has "forfeit[ed] the right to have the argument addressed on appeal." *Vance v. Wade*, 546 F.3d 774, 781 (6th Cir. 2008) (citation omitted). We do not review forfeited arguments to "ensure fairness to litigants by preventing surprise issues from appearing on appeal." *Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 552 (6th Cir. 2008). On rare occasions, we may excuse a forfeiture to avoid "a plain miscarriage of justice." *Id.* But Saltmarshall does not tell us why we should do so here. His opening brief did not acknowledge his failure to make these arguments below. And in response to the officers' argument

9

that the claim was forfeited, Saltmarshall dropped the point in his reply brief. Saltmarshall thus forfeited both his substantive argument in the district court as well as "any argument that he did *not* forfeit [that argument] in this [C]ourt." *Nat'l Cont'l Ins. Co. v. Aiazbekov*, 818 F. App'x 468, 473 (6th Cir. 2020). As such, we decline to review Saltmarshall's claim.

*Malicious Prosecution.* Saltmarshall next argues that Smith and Munson participated in a malicious prosecution when they helped prosecutors bring felony charges against Saltmarshall. To prevail, Saltmarshall must show (among other things) that the officers (1) "made, influenced, or participated in the decision to prosecute" and (2) helped start a prosecution against him without probable cause. *Mills v. Barnard*, 869 F.3d 473, 479–80 (6th Cir. 2017) (cleaned up); *King v. Harwood*, 852 F.3d 568, 580 (6th Cir. 2017). Here too, probable cause exists when the totality of the temporal circumstances makes a reasonable person believe that "the accused was guilty of the crime charged." *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015) (cleaned up).

Liability for malicious prosecution extends to those who either influenced or made the ultimate decision to prosecute. *Jones*, 947 F.3d at 918. A police officer is liable when he provides deliberate or reckless falsehoods in his investigatory materials leading to an arrest and prosecution without probable cause. *See Sykes*, 625 F.3d at 312. Michigan's version of malicious prosecution contains largely the same elements, but also requires Saltmarshall to show that the officers acted with "malice." *See Matthews v. Blue Cross & Blue Shield of Mich.*, 572 N.W.2d 603, 609–10 (Mich. 1998). An officer acts with malice when he "knowingly swears to false facts . . . without which there is no probable cause." *Payton v. City of Detroit*, 536 N.W.2d 233, 242 (Mich. Ct. App. 1995); *Odom*, 760 N.W.2d at 229; *see also Newman*, 773 F.3d at 773 (requiring more than a showing of mere recklessness).

Saltmarshall alleges that Munson's report contains false statements and material omissions that provided the basis for his prosecution, and that Smith, as Munson's supervisor, authorized Munson's actions, testified about the findings of his report at Saltmarshall's arraignment, and was responsible for Saltmarshall's time in jail before his arraignment. Saltmarshall's claim is flawed in two respects. First, there is no evidence that Munson or Smith were consulted when the Prosecuting Attorney's Office decided to charge Saltmarshall. Rather, the prosecutor and her supervisor made that decision after reviewing multiple documents, including Janiyah's medical records, her SAFE report, and Munson's investigative report. The officers cannot be held liable for a prosecution they did not recommend or make. *Skousen v. Brighton High Sch.*, 305 F.3d 520, 529 (6th Cir. 2002).

Second, although Saltmarshall claims that Munson provided deliberate or reckless falsehoods to prosecutors through his investigatory materials, no reasonable juror could agree. Munson's report accurately summarized Saltmarshall's description of the events leading up to his 911 call. And it explained Wright's findings that Janiyah had injuries to her anus which could not be explained by Saltmarshall's version of the events.

The report also accurately described Munson's interviews with Saltmarshall. It detailed that Saltmarshall believed Janiyah accidentally suffocated while they slept together. It included Saltmarshall's statement that if he shook Janiyah, it was to try and wake her when he realized she was not breathing. It stated that Saltmarshall first denied, but then acknowledged, that Janiyah had fallen from the bed. And it showed that Saltmarshall consistently denied involvement in Janiyah's rectal injuries. True, Munson could have added that Saltmarshall thought Janiyah might have slipped from the bed while he was frantically trying to perform CPR. But failing to do so did not materially strengthen the case against Saltmarshall.

Like Smith, Munson had no reason to question the truthfulness of the doctors' medical findings conveyed to him. He accurately listed them, keeping out speculative conclusions, including one doctor's proclamation that the "perpetrator murdered this child." The report indicated that Janiyah showed signs of shaken baby syndrome, and that at least one doctor ruled out the possibility that the rectal tear could have been caused by constipation. The autopsy report showed just how wrong the doctors' clinical findings turned out to be. But that did not make Munson's reliance on them reckless, let alone malicious.

Munson also provided exculpatory evidence. He noted that while one doctor stated that Janiyah had skull fractures, another could not confirm their existence or any obvious external trauma to the head. Nor did that doctor believe Janiyah's injuries could have been caused by falling from a bed. He included Janiyah's mother's belief that Saltmarshall would not hurt Janiyah. And he made clear that Saltmarshall consistently denied any involvement in Janiyah's rectal injuries.

As for Smith, we have already determined he had probable cause to arrest Saltmarshall. Between Saltmarshall's arrest and his arraignment, the medical findings only bolstered the likelihood that Janiyah's injuries were intentional. Smith's hearing testimony covered his initial probable cause determination to arrest and the findings in Munson's report. When an autopsy later showed that Janiyah did not display signs of intentional harm, Saltmarshall was released from jail and the charges against him were dropped. The district court thus properly dismissed Saltmarshall's malicious prosecution claims.

## CONCLUSION

Saltmarshall experienced a tragedy in Janiyah's passing, and further agony due to false accusations.  But as those accusations were reasonable given the information known at the time, we must affirm the judgment of the district court.