PETZOLD v BORMAN'S, INC

Docket No. 211567. Submitted May 2, 2000, at Detroit. Decided July 18, 2000, at 9:05 A.M.

Karl Petzold brought an action in the Wayne Circuit Court against Borman's, Inc., and Gary Chapell, alleging that the defendants violated the Handicappers' Civil Rights Act (HCRA), now known as the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.*, when they terminated his employment as a Farmer Jack's grocery store courtesy clerk or bagger and when they failed to make workplace accommodations for his Tourette Syndrome (TS), a neurological disorder that causes the plaintiff to involuntarily utter obscenities and racial epithets in the presence of customers, children, and fellow employees. The defendants moved for summary disposition, which the court, Michael J. Callahan, J., denied. The defendants appealed by leave granted.

The Court of Appeals *held*:

1. The trial court erred in denying summary disposition of the discrimination claim. The plaintiff failed to establish a prima facie case of employment discrimination under the HCRA because the plaintiff's TS is not unrelated to his ability to perform the duties of his job or position. The plaintiff's offensive language made him unfit for his job. Furthermore, a disabled employee may be discharged for misconduct, even where the misconduct is a manifestation of the employee's disability. The plaintiff's offensive language violated Farmer Jack work rules against abusive language or discourteous conduct toward customers, supervisors, or fellow employees.

2. The trial court erred in denying summary disposition of the claim of failure to make workplace accommodations. In order to bring a cause of action under the HCRA for failure to make accommodations, a plaintiff must have advised the defendant in writing of the need for accommodation. MCL 37.1210(18); MSA 3.550(210)(18). The plaintiff in this case gave no such notice.

Reversed.

1. CIVIL RIGHTS — PERSONS WITH DISABILITIES — EMPLOYMENT DISCRIMINATION.

A prima facie case of discrimination under the Handicappers' Civil Rights Act, now known as the Persons with Disabilities Civil Rights

Act, is established where the plaintiff is "handicapped" as defined in the statute, the handicap is unrelated to the plaintiff's ability to perform the duties of a particular job or position or is unrelated to the plaintiff's qualifications for employment or promotion, and the plaintiff has been discriminated against in one of the ways set forth in the statute (MCL 37.1103[e][i][A], 37.1202[1]; MSA 3.550[103][e][i][A], 3.550[202][1]).

2. CIVIL RIGHTS — PERSONS WITH DISABILITIES — EMPLOYMENT DISCRIMINATION — TERMINATION — MISCONDUCT.

A disabled employee's discharge for misconduct does not constitute discrimination under the Handicappers' Civil Rights Act, now known as the Persons with Disabilities Civil Rights Act, even where the misconduct is a manifestation of the employee's disability.

*Cutler & Associates, P.L.L.C.* (by *Michael H. Cutler*), for the plaintiff.

*Brown Schwartz Patterson & Ankers* (by *Malcolm D. Brown* and *Craig S. Schwartz*), for the defendants.

Before: McDONALD, P.J., and GAGE and TALBOT, JJ.

McDONALD, P.J. Defendants, Borman's, Inc., doing business as Farmer Jack,[1] and Gary Chapell, appeal by leave granted the trial court's denial of their motion for summary disposition in this action under the Handicappers' Civil Rights Act (HCRA), now known as the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.*; MSA 3.550(101) *et seq.* We reverse.

The relevant facts in this case are largely undisputed. Plaintiff, Karl Petzold, suffers from a rare neurological disorder known as Tourette Syndrome (TS). He has had TS since he was seven years old. In order to understand the events in this case, it is first necessary to have a basic understanding of plaintiff's disorder. The symptoms of TS include motor and vocal tics.

---

[1] Consistent with the parties, we will refer to defendant Borman's, Inc., as "Farmer Jack" throughout this opinion.

Vocal tics are "the utterance of noises, words, and sometimes unacceptable language, which is called coprolalia." Levi-Pearl & Cohen, *Understanding Coprolalia*, (Tourette Syndrome Assoc, Inc, 1994). [2] Plaintiff has coprolalia. The pamphlet in the record entitled *Understanding Coprolalia* includes the following information:

> *What is Coprolalia?*
> Coprolalia is a medical term used to describe one of the most baffling and socially stigmatizing symptoms of Tourette Syndrome—the *involuntary* outburst of obscene words or socially inappropriate and derogatory remarks, which may include ethnic or religious slurs. Other examples may include references to genitals, excrement and sexual acts. Although coprolalia is the most well known symptom of TS, it occurs in only a minority of TS patients.
>
> \*     \*     \*
>
> *How is Coprolalia Manifested?*
> While obscenities and profanities may be common in everyday conversation in our culture, coprolalia is different from simply swearing or using bad language. These vocal tics usually are not uttered within social or emotional contexts, and are often spoken or repeated compulsively in a louder tone or different cadence or pitch than normal conversational speech. Particularly embarrassing for some individuals with coprolalia are involuntary outbursts within social contexts, such as racial or ethnic slurs in the company of the very people who would be most offended by such remarks. A minority of people with coprolalia have this particular problem. [Emphasis in original.]

At his deposition, plaintiff explained his coprolalia causes him to say the obscene terms "f . . . " and

---

[2] This pamphlet and other information is available on the website maintained by the Tourette Syndrome Association, Inc. <http://tsa.mgh.harvard.edu/> (visited July 3, 2000).

"b . . . . " and racial epithets, especially "n . . . . .." Plaintiff also utters shortened forms of these words, for example, "nig." Plaintiff compared his coprolalia to a sneeze in that he can feel it coming on, but is unable to control it, even with medication. The coprolalia causes him to utter obscenities and racial epithets regularly, usually when he is talking to someone or under stress. Plaintiff explained that his coprolalia would most likely cause him to use the word "n . . . . .," often accompanied by the word "f . . . ," when he is with persons who are African-American. Similarly, plaintiff testified that he would be more likely to say the word "b . . . . " if he were talking with a woman.

Plaintiff began working at defendant Farmer Jack's grocery store located in the city of Hamtramck in July 1995. He was hired for a part-time position that is alternatively known as "courtesy clerk" or "bagger." His job duties included bagging groceries for customers at the checkout counter, retrieving shopping carts from the parking lot, changing the bags in the bottle-return machines, and sometimes assisting elderly customers by taking their groceries to their cars. These tasks placed him in continual contact with customers and other employees, the majority of whom are African-American and many of whom are female. At his deposition, plaintiff admitted that his coprolalia caused him to utter obscene terms and racial epithets in the presence of customers, children, and other employees on a daily basis.

Plaintiff remained employed at Farmer Jack for approximately ten months. However, an incident occurred in May 1996 that led to the termination of

plaintiff's employment.[3] One evening plaintiff was bagging groceries at Loretta Wilkins' register. Wilkins' affidavit states there was a line of customers at her register, including a woman and several young men who were African-American. Plaintiff began loudly stating "n . . . . ., n . . . . .." When Wilkins called his name twice and asked him not to say that, plaintiff acted confused and started putting orders in the wrong shopping baskets. When a woman asked where her meat was, the young men waiting in the line laughed. According to Wilkins, plaintiff then "blurted out loudly, f . . . you, f . . . you, n . . . ., n . . . . .." The young men were "outraged" and asked Wilkins what plaintiff said. Although Wilkins explained that plaintiff just talked to himself all the time and did not mean any harm, the young men continued to be angry and Wilkins was "worried that they might retaliate against [plaintiff] after he left work that night."

The store manager, David Flis, testified at his deposition that an African-American male customer complained to Flis regarding plaintiff's language that evening. The man was "irate" and reported that plaintiff was "saying the N-word and he was swearing." The man also told Flis that he would handle the problem with plaintiff himself if Flis did not handle it. Flis called plaintiff into his office and asked him what he had said. Plaintiff admitted to Flis that he had said the words "f . . . " and "n . . . . .," but Flis could not remember the exact order or how many times plaintiff had used each word.

---

[3] There are inconsistencies in the record regarding the specific date of the incident.

Plaintiff testified candidly at his deposition that on the night the customer complained, he was loudly saying "f . . . , f . . . , n . . . . ., n . . . . . ." Plaintiff did not recall saying "f . . . you." Plaintiff again explained that his uttering of the offensive words was "part of [his] disability," that he was not doing it intentionally or "trying to deliberately upset people."

Plaintiff was sent home before his shift ended on the night of the incident, which turned out to be his last night of employment. On another date, plaintiff was given a "Corrective Action Notice" that indicated he was "suspended pending advisability of discharge" because of his "failure to perform job functions per company policies [and] procedures" on the night in question. Plaintiff filed a grievance with his union, United Food & Commercial Workers Union Local No. 876, claiming he was unjustly suspended, but the union's executive board determined his grievance lacked merit and would not be taken to arbitration. Plaintiff's employment was eventually officially terminated. A letter dated June 28, 1996, from Farmer Jack's director of personnel indicated that "courteous and proper treatment" of customers and co-workers were essential job functions that plaintiff was unable to fulfill. The letter also stated that plaintiff's "inappropriate (if not completely offensive) outbursts and comments" could not be tolerated and that "regardless of whether these outbursts and comments are voluntary or involuntary we still cannot permit our customers, employees or vendors to be subjected to them."

On January 23, 1997, plaintiff filed his complaint in this case. Plaintiff alleged that his Tourette Syndrome was a handicap under the HCRA, that his TS did not

affect his ability to perform the duties and requirements of his job, and that defendants terminated his employment because of his TS in violation of the HCRA. Plaintiff further alleged that defendants failed to accommodate his handicap as required by the HCRA.

Defendants moved for summary disposition on January 23, 1998, under MCR 2.116(C)(10), arguing that plaintiff did not qualify as a handicapper under the HCRA because his TS is not unrelated to his ability to perform the job. Defendants also argued that plaintiff's claim for failure to accommodate should be dismissed because plaintiff admitted that he never made a written request for accommodation as required by the HCRA. Following a hearing, the trial court denied defendants' motion for summary disposition. Defendants sought interlocutory leave to appeal in this Court, which was granted.

Defendants argue the trial court erred in denying their motion for summary disposition. We agree.

We review a trial court's ruling on a motion for summary disposition de novo. *Spiek v Dep't of Transportation*, 456 Mich 331, 337; 572 NW2d 201 (1998). When a motion under MCR 2.116(C)(10) is made, the court considers the affidavits, pleadings, depositions, admissions, and other documentary evidence submitted or filed in the action to determine whether a genuine issue of any material fact exists to warrant a trial. *Id.*

The HCRA protects individuals from discrimination based on their handicapped status. *Chmielewski v Xermac, Inc*, 457 Mich 593, 601; 580 NW2d 817 (1998). The HCRA "prohibits discrimination, including in hiring, firing, and advancement." *Tranker v Figgie Int'l, Inc*, 231 Mich App 115, 121; 585 NW2d 337 (1998);

MCL 37.1202; MSA 3.550(202). "The purpose of the act is to mandate 'the employment of the handicapped to the fullest extent reasonably possible.'" *Chmielewski, supra* at 601, quoting *Allen v Southeastern Michigan Transportation Authority*, 132 Mich App 533, 537-538; 349 NW2d 204 (1984).

A prima facie case of discrimination under the HCRA is established where (1) the plaintiff is "handicapped" as defined in the statute, (2) the handicap is unrelated to the plaintiff's ability to perform the duties of a particular job or position or is unrelated to the plaintiff's qualifications for employment or promotion, and (3) the plaintiff has been discriminated against in one of the ways set forth in the statute. *Chmielewski, supra* at 602; *Collins v Blue Cross Blue Shield of Michigan*, 228 Mich App 560, 568; 579 NW2d 435 (1998); MCL 37.1202(1); MSA 3.550(202)(1), MCL 37.1103(e)(i)(A); MSA 3.550(103)(e)(i)(A).

Defendants argue that plaintiff failed to establish a prima facie case because he has not demonstrated that his TS is unrelated to his ability to perform his job. We agree. Plaintiff's offensive language, which he admitted using on a daily basis in the presence of customers, children, and other employees, made him unfit for his job as a bagger as a matter of law. In reaching this holding, we emphasize that there certainly are jobs that persons with TS and coprolalia could perform. However, plaintiff's coprolalia renders him completely unqualified to perform this particular job, which required continual contact with members of the general public. We find that it would be ridiculous to expect a business such as defendant Farmer Jack to tolerate this type of language in the presence of its customers, even though we understand that

because of plaintiff's condition, his utterance of obscenities and racial epithets is involuntary.

Defendants further argue the trial court erred in concluding that Farmer Jack's uniform work rules, which prohibit "abusive language to any employee, supervisor or customer" and "discourtesy towards customers, supervisors, or fellow employees" were not determinative of this case. We agree. In *Collins*, *supra*, this Court held that the defendant was entitled to terminate the plaintiff's employment because the plaintiff's psychological disorder caused her to express homicidal ideation regarding her immediate supervisor to a psychiatrist assigned to evaluate her disability claim. *Collins, supra* at 563-564, 568-569. This Court held that "a disabled employee may be discharged for misconduct, even where the misconduct is a manifestation of the employee's disability." *Id.* at 569. The trial court incorrectly limited *Collins, supra*, to its facts involving homicidal ideation. We agree with defendants that the holding of *Collins* is applicable to this case. In the instant case, plaintiff's TS caused him to utter offensive language in the presence of customers and other employees. This constituted misconduct, especially considering defendant Farmer Jack's uniform work rules that prohibit "abusive language to any employee, supervisor or customer" and "discourtesy towards customers, supervisors, or fellow employees." Plaintiff has presented no evidence that he was terminated because of his disability, rather than his misconduct. Indeed, plaintiff admitted that he did not suffer discrimination at his job until he was fired after Farmer Jack received customer and employee complaints. Accordingly, the trial court should have granted summary disposition

in favor of defendants with regard to plaintiff's claim under the HCRA.

Defendants next argue that they were entitled to summary disposition of plaintiff's claim that defendants failed to accommodate his handicap, as required by the statute. The HCRA requires an employer to take reasonable steps to accommodate a handicapped employee's disability. MCL 37.1102(2); MSA 3.550(102)(2); *Rourk v Oakwood Hosp Corp*, 458 Mich 25, 29; 580 NW2d 397 (1998). In order to bring a cause of action under the statute for failure to accommodate in employment, the employee must advise the employer in writing of the need for accommodation. *Sanchez v Lagoudakis (After Remand)*, 458 Mich 704, 724, n 25; 581 NW2d 257 (1998). The statute provides in relevant part:

> A handicapper may allege a violation against a person regarding a failure to accommodate under this article *only if the handicapper notifies the person in writing* of the need for accommodation within 182 days after the date the handicapper knew or reasonably should have known that an accommodation was needed. [MCL 37.1210(18); MSA 3.550(210)(18) (emphasis added).][4]

In this case, it is undisputed that at no time did plaintiff make a written request for accommodation. In his deposition, plaintiff stated that his only request for accommodation was verbal. Plaintiff does not address this issue on appeal. We conclude that the trial court erred in denying defendants' motion for summary disposition of the issue of defendants' failure to make reasonable accommodations.

Reversed.

---

[4] The statute now uses the term "person with a disability" instead of "handicapper."