NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0350n.06

No. 24-1903

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Jul 16, 2025
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| DONNA POPLAR, | ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) | |
| GENESEE COUNTY ROAD COMMISSION, | ) | OPINION |
| Defendant-Appellant. | ) | |

BEFORE: MOORE, GRIFFIN, and KETHLEDGE, Circuit Judges.

GRIFFIN, Circuit Judge.

In this employment case, a jury returned a verdict for plaintiff Donna Poplar against her employer, defendant Genesee County Road Commission, on two sets of claims: (1) retaliation for Poplar's complaints of discrimination and (2) failure to accommodate Poplar's vision disability. On appeal, the Commission challenges the district court's denials of its motions for judgment as a matter of law and for a new trial. None of the Commission's arguments warrant upending the jury verdict, so we affirm.

I.

A.

The Genesee County Road Commission is a government agency that maintains roads and bridges within Genesee County, Michigan. It is led by a Board of Directors, which appoints and supervises a Managing Director, who in turn controls the Commission's operations. From 1999 to 2018, the Managing Director was John Daly, and from 2018 to 2023, it was Fred Peivandi.

In 2016, Donna Poplar interviewed to be the Commission's Human Resources Director. Poplar suffers from a permanent vision disability: she is blind in her right eye and suffers from chronic open-angle glaucoma in her left. When she interviewed with the Commission, she disclosed her disability to then-Managing Director Daly. The Commission hired Poplar as its Human Resources Director in October 2016.

Within three months of her hire date, Poplar requested several disability accommodations. For instance, she requested a parking spot closer to the building, a larger computer screen, and dimmer lights in her office—all of which the Commission provided. Around November 2016, she also made a verbal request to Daly for an assistant to help her with reading and computer work.

The Commission did not immediately fulfill that latter request, but it took steps to hire an HR Assistant. In January 2017, the Board budgeted for a part-time HR Assistant, at first solely to fulfill operational needs, not as an accommodation to Poplar. Yet the position went unfilled through 2018.

In May 2018, Poplar visited her doctor due to "severe eye pain." Her doctor advised that her complaints stemmed from the number of hours she spent reading and working on the computer. Soon after, Poplar submitted a written request for a disability accommodation in the form of a part-time assistant to help her with reading and computer work. In August 2018, after this request went unfulfilled and after Fred Peivandi assumed the Managing Director role, she reiterated the request to Peivandi by email. The Board then approved an HR Assistant to be hired, as it had already been budgeted.

Yet by February 2019, the HR Assistant position remained unfilled. Poplar then filed a charge with the EEOC against the Commission and Peivandi for discriminating against her based on her disability and race by refusing to hire an HR Assistant to accommodate her disability.

The following month, the Commission hired Monica Pearson as the HR Assistant. Initially, the position was for part-time work, but it became a full-time position in October 2019.

Pearson's job duties encompassed helping Poplar and typical clerical tasks. For instance, her duties encompassed "help[ing] the HR director with reading internal and external materials [and] legal documents," as well as "reading and replying to E-mail correspondence." She also assisted Poplar with research, building PowerPoint presentations, and other computer work. Pearson remained in that role from March 2019 until October 2021, when she was promoted to the position of Benefits Coordinator.

In the meantime, Poplar filed more complaints against Peivandi and the Commission. In January 2021, Poplar filed an internal complaint with the Commission's Board, alleging that Peivandi subjected her to a hostile work environment. And in May 2021, she filed another EEOC complaint against the Commission, alleging race discrimination.

In August 2021, after Poplar distributed to Commission employees a memorandum that Peivandi did not authorize, Peivandi gave Poplar a written Disciplinary Action Notice, which put Poplar on a two-week, unpaid suspension. During her suspension, Poplar filed another internal complaint against Peivandi, alleging race discrimination, harassment, and a hostile work environment. The Commission then placed Poplar on paid administrative leave for several months while it decided how to address her complaint.

In November 2021, the Board approved Poplar to return to work, where she was to report to Operations Director Randy Dellaposta. When she returned, Poplar learned that Pearson had been promoted, and, as a result, the HR Assistant position was vacant. Poplar sent an email to Dellaposta requesting to fill the assistant position. But the Commission did not fill the vacancy, seemingly because Peivandi "did not want to."

Poplar complained to the Board that she was not being accommodated for her visual disability after she lost her assistant, but the position was never again filled. Poplar continues to work as the Commission's Human Resources Director, without a dedicated reader to accommodate her disability, to this day.

B.

Also in November 2021, Poplar filed this lawsuit. She later amended her complaint to allege a total of eight claims against the Commission and Peivandi for race-based discrimination, retaliation, and failure to accommodate. For the retaliation claims, Poplar asserts that several adverse actions—including (1) the imposition of her two-week, unpaid, disciplinary suspension and (2) the promotion of Pearson and subsequent failure to fill the HR Assistant position—were retaliation against her for protected activity, namely, her assertion of complaints of discrimination against the Commission and Peivandi.

Following the district court's summary-judgment decision, four counts of retaliation (under Title VII of the Civil Rights Act of 1964; 42 U.S.C. § 1981; Michigan's Elliott-Larsen Civil Rights Act; and Michigan's Persons with Disabilities Civil Rights Act) and one count for failure to accommodate (under Michigan's Persons with Disabilities Civil Rights Act) remained for trial. The parties tried the case before a jury in an eight-day trial. At the close of evidence, the Commission moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a) on the failure-to-accommodate claim. The district court denied that motion. The jury then returned a verdict in Poplar's favor on all claims, awarding her a total of $800,000 in damages.

Following trial, the Commission made a renewed motion for judgment as a matter of law under Rule 50(b). Alternatively, it moved for a new trial under Rule 59 or for remittitur of damages. The district court denied those motions. This appeal followed.

II.

We begin with the Commission's arguments that it was entitled to either summary judgment or judgment as a matter of law on the failure-to-accommodate claim under Michigan's Persons with Disabilities Civil Rights Act. The Commission asserts it was entitled to judgment on this claim for four reasons: (1) Poplar's written notice of her need for an accommodation was untimely, (2) her requested accommodation was unreasonable, (3) the accommodations the Commission provided were reasonable alternatives, and (4) the district court misquoted a statute in its order denying summary judgment.

When evaluating state-law claims like this one brought under supplemental jurisdiction, we apply federal procedural law and state substantive law—just as we do for claims brought under diversity jurisdiction. *Jones v. City of Elyria*, 947 F.3d 905, 912 (6th Cir. 2020); *see also United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1996); 28 U.S.C. § 1652. Thus, we apply Michigan substantive law to Poplar's state-law-based failure-to-accommodate claim. *Cf. Olenik v. Ohio Cas. Ins.*, 114 F.4th 821, 825 (6th Cir. 2024) (considering state-law claims under diversity jurisdiction).

Before trial, under Rule 56, a party may move for summary judgment. The moving party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At trial, under Rule 50(a)—after the nonmoving party has presented its evidence but "before the case is submitted to the jury"—a party may make an initial motion for judgment as a matter of law. The district court may grant such a motion when it determines (1) "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the [nonmoving] party on [an] issue," and (2) that, "under the controlling law," the nonmoving party could maintain a claim "only with a favorable

finding on that issue." Fed. R. Civ. P. 50(a). If the court denies that initial Rule 50(a) motion and the jury later returns a verdict against the moving party, then that party "may file a renewed motion for judgment as a matter of law" under Rule 50(b).

The inquiry for resolving Rule 56 and Rule 50 motions is "the same," *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 794 (6th Cir. 2004) (en banc), *aff'd*, 548 U.S. 53 (2006), so we consolidate our review of the district court's decisions. When reviewing the denial of a motion for judgment as a matter of law—as when reviewing the denial of a motion for summary judgment—we consider the evidence in the light most favorable to the nonmoving party. *Khalaf v. Ford Motor Co.*, 973 F.3d 469, 481–82 (6th Cir. 2020) (motion for judgment as a matter of law); *see also Plumhoff v. Rickard*, 572 U.S. 765, 768 (2014) (motion for summary judgment). We neither weigh evidence nor question witness credibility. *Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 531 (6th Cir. 2005) (motion for judgment as a matter of law); *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 569 (6th Cir. 2012) (motion for summary judgment). Judgment as a matter of law, like summary judgment, is appropriate if "there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Tisdale*, 415 F.3d at 527; *see also Ohio Citizen Action*, 671 F.3d at 569–70.

"[W]here an appellant made a Rule 56 motion for summary judgment that was denied, makes those same arguments in a Rule 50(a) motion at the close of evidence that was also denied, lost in front of a jury, then renewed its arguments in a rejected Rule 50(b) motion after the entry of judgment," we typically "review only the denial of the Rule 50(b) motion." *K & T Enters., Inc. v. Zurich Ins.*, 97 F.3d 171, 174 (6th Cir. 1996). Our focus is on "the complete trial record and not the incomplete pretrial record." *Seales v. City of Detroit*, 959 F.3d 235, 245 (6th Cir. 2020) (citation modified) (quoting *K & T Enters.*, 97 F.3d at 174). But here, because the Commission

alleges a specific, prejudicial legal error in the summary-judgment decision, we address that as well. *See Dupree v. Younger*, 598 U.S. 729, 735–36 (2023).

A.

First, the Commission asserts that it was entitled to judgment as a matter of law on the failure-to-accommodate claim because of the alleged untimeliness of Poplar's written notice of her need for an accommodation under Michigan Compiled Laws § 37.1210(18). We review the district court's denial on this ground de novo. *See Noble v. Brinker Int'l, Inc.*, 391 F.3d 715, 720 (6th Cir. 2004).

Michigan's Persons with Disabilities Civil Rights Act includes a timely-written-notice requirement, which provides:

> A person with a disability may allege a violation against [an employer] regarding a failure to accommodate under this article only if the person with a disability notifies the [employer] in writing of the need for accommodation *within 182 days after the date the person with a disability knew or reasonably should have known that an accommodation was needed*.

Mich. Comp. Laws § 37.1210(18) (emphasis added); *see also id.* § 37.1103(g). In other words, "[i]n order to bring a cause of action under the statute for failure to accommodate in employment, the employee must [timely] advise the employer in writing of the need for accommodation." *Petzold v. Borman's, Inc.*, 617 N.W.2d 394, 398 (Mich. Ct. App. 2000). Although this timely-written-notice requirement applies only if the employer "post[s] notices or use[s] other appropriate means to provide all employees and job applicants with notice of" that requirement, Mich. Comp. Laws § 37.1210(19), the parties agree here that the Commission presented evidence that it posted the required notices. Thus, the Commission may invoke the timely-written-notice requirement. *Id.* § 37.1210(18).

The Commission asserts that, although Poplar eventually provided written notice, that notice was not timely. Its argument goes like this. When Poplar was hired in October 2016, she knew that she suffered from a permanent vision disability, and she disclosed this disability during her interview. Shortly after her hire date, she verbally asked then-Managing Director Daly for an assistant as an accommodation. Poplar made no written request for that accommodation within 182 days of the verbal request. Thus, the Commission asserts that Poplar missed her one and only window to give written notice of her need for an assistant as an accommodation.

Poplar responds by arguing that, regardless of what happened in 2016, the evidence shows two later times when she realized that an assistant "was needed," after which she provided timely written notice. *See* Mich. Comp. Laws § 37.1210(18). The first time was in May 2018, after she visited her doctor and learned that her recent eye pain was due to computer work. Shortly after that appointment, she submitted paperwork requesting an assistant and sent a follow-up email to Peivandi asking for that accommodation. Following those written requests, the Commission eventually (in March 2019) hired Pearson as the HR Assistant, whose job description included specific duties related to accommodating Poplar's disability.

The second time Poplar realized an assistant "was needed" was in November 2021, after she returned from administrative leave and learned that Pearson had been promoted, that Pearson would no longer be required to accommodate Poplar's disability, and that the HR Assistant position was vacant. Poplar immediately sent an email to Dellaposta asking to fill the position, which Dellaposta acknowledged was a written request for a visual disability accommodation.

The evidence thus presents three possibilities for "the date" on which Poplar "knew or reasonably should have known that an accommodation was needed," Mich. Comp. Laws § 37.1210(18)—one for which Poplar did not provide timely written notice (October 2016) and

two for which she did (May 2018 and November 2021). While Poplar asserts that she needed to provide only the November 2021 written notice (because the Commission's failure to replace Pearson from 2021 onward is the conduct that underlies her claim), the Commission argues that, as a matter of law, the October 2016 verbal disclosure triggered the single notice window and that later events cannot trigger another notice period.

But the Commission provides no on-point precedent to support its argument. For instance, although the Commission repeatedly cites *Bageris v. Brandon Township*, 691 N.W.2d 459 (Mich. Ct. App. 2004), for a strict reading of the timely-written-notice requirement, that case is distinguishable. *Bageris* held that an employee, when providing written notice of the need for an accommodation, must explain "why an accommodation is needed, in terms of some physical or mental condition." *Id.* at 463. It does not answer the relevant question here: what "date" triggers § 37.1210(18)'s 182-day written-notice window when changing circumstances provide for multiple potential dates that the plaintiff reasonably knew she needed an accommodation.

Likewise unhelpful is the Commission's citation to *In re Estate of Stern*, 2010 WL 2836325, at *9 (Mich. Ct. App. July 20, 2010) (per curiam). Although *Stern* found a failure to provide timely written notice, it focused on the claimant's backward-looking request for relief stemming from a lack of accommodation at a past court hearing. *See id.* at *6–9. Its lack-of-notice reasoning does not map on to a forward-looking request for accommodation in ongoing employment. And the Commission's other cited cases—such as two where the plaintiffs "never" submitted any written request for accommodation—are inapposite. *See, e.g.*, *Ayer v. Hare Express, Inc.*, 2004 WL 385047, at *4 (Mich. Ct. App. Jan. 15, 2004); *Aston v. Tapco Int'l Corp.*, 2014 WL 3385073, at *22 (E.D. Mich. July 10, 2014), *aff'd*, 631 F. App'x 292 (6th Cir. 2015). Thus, none of the Commission's cited cases are strong data points to determine how the Michigan

Supreme Court would apply the timely-written-notice requirement here. *See Allstate Ins. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001).

But while Michigan caselaw does not answer the triggering-date question, the statute's purpose suggests an answer in Poplar's favor. Michigan courts are to construe the language of the Persons with Disabilities Civil Rights Act "reasonably, keeping in mind the purpose of the act." *Bachman v. Swan Harbour Ass'n*, 653 N.W.2d 415, 427 (Mich. Ct. App. 2002). That purpose is to ensure "the employment of the handicapped to the fullest extent reasonably possible." *Peden v. City of Detroit*, 680 N.W.2d 857, 863 (Mich. 2004) (citation modified).

Given the evidence of several potential triggering dates for the notice period, the lack of controlling caselaw, and the statute's purpose to ensure the employment of people with disabilities, the Commission was not entitled to judgment as a matter of law on this issue. The evidence, viewed in the light most favorable to Poplar, supports her assertion: that either her 2018 doctor's appointment or her 2021 return from leave opened a new 182-day window for her to provide written notice of her need for an accommodation, and that she timely gave such notice after those dates. Whether she timely gave written notice was thus for the jury to decide.

B.

Next up are the Commission's arguments that it was entitled to judgment as a matter of law either because Poplar's requested accommodation was unreasonable or because the Commission provided reasonable alternative accommodations. Although the parties disagree about whether the Commission preserved this argument for appellate review, we need not resolve these preservation arguments because the Commission's merits arguments fail even under de novo review. We thus assume without deciding that the Commission preserved these arguments and

review the denial of judgment as a matter of law on these grounds de novo. *See Noble*, 391 F.3d at 720.

1.

First, the Commission asserts that Poplar's requested accommodation—a part-time assistant to help with reading and computer work—was *per se* unreasonable. The Persons with Disabilities Civil Rights Act provides that an employer "shall accommodate a person with a disability for purposes of employment" unless the employer "demonstrates that the accommodation would impose an undue hardship." Mich. Comp. Laws § 37.1102(2). In other words, the Act requires that an employer "take reasonable steps to accommodate a handicapped employee's disability." *Petzold*, 617 N.W.2d at 398. An employer need not provide accommodations that would eliminate essential job functions or exempt an employee from performing those functions. *See Mauro v. Borgess Med. Ctr.*, 886 F. Supp. 1349, 1354 (W.D. Mich. 1995) (holding that the employer was not required to provide another surgical tech to accommodate an HIV-positive surgical tech who could not place his hands inside patient).

The Commission argues that providing a part-time employee to assist Poplar with computer work and reading would unreasonably "eliminate an essential function of her position." For support, it cites Poplar's stipulation that "[r]eading and computer screen work are each essential functions of the HR Director job." But Poplar did not request an HR Assistant to eliminate reading or computer work from her job; she instead sought part-time help with those tasks. Poplar can perform those tasks even without the requested accommodation, as she has done since November 2021. She requested assistance because of the heavy volume of reading and computer work required and the effect that screen time has on her vision. *See, e.g., Rojek v. Cath. Charities of Jackson, Inc.*, 2010 WL 2232240, at *12 (E.D. Mich. May 27, 2010) (holding that the requested

accommodation by a blind social worker for an assistant to accompany her on some home visits was not *per se* unreasonable because the "Plaintiff ha[d] not proposed that an assistant accompany her on every home visit, nor that an assistant take on an essential function of the job").

Poplar's request is not *per se* unreasonable for at least two reasons. First, the very text of the Persons with Disabilities Civil Rights Act supports the reasonableness of her request. The Act explicitly contemplates the hiring or retention of "readers or interpreters to accommodate the person with a disability in performing the duties of his or her job." Mich. Comp. Laws § 37.1210(8)–(12), (16). In a series of subsections, the Act provides formulae for assessing whether "the cost" of hiring such "readers or interpreters" amounts to an "undue hardship" on an employer, depending on the employer's headcount. *Id.* The Commission, as an employer with "25 or more employees," would fall into the highest-allowable cost category. *See id.* § 37.1210(11). Granted, these specific provisions technically do not apply to public employers like the Commission, *see id.* § 37.1210(17), but their repeated mention of a reader suggests that, at least in other employment settings, a reader is a reasonable accommodation. That statutory language thus weakens the Commission's argument that such an accommodation is *per se* unreasonable.

Second, the Commission's own conduct demonstrates why this accommodation is not *per se* unreasonable—the Commission provided this accommodation to Poplar for over two years, from March 2019 to August 2021. Although the Commission cites *Steward v. DaimlerChrysler Corp.*, 533 F. Supp. 2d 717, 722 (E.D. Mich. 2008), *aff'd sub nom. Steward v. New Chrysler*, 415 F. App'x 632 (6th Cir. 2011), for the proposition that a previously provided accommodation that is later removed can still be unreasonable, there, unlike here, the provision of an assistant "eliminat[ed] an essential function of the job." *Id.* The assistant here merely provided part-time

help with these functions.    Accordingly, whether Poplar's requested accommodation was reasonable was for the jury to decide.

2.

The Commission next argues that it offered Poplar reasonable alternative accommodations—namely, a larger computer screen, dimmer lights, and some continued assistance by Pearson.  Under the Persons with Disabilities Civil Rights Act, "an employee cannot make his employer provide a specific accommodation if another reasonable accommodation is instead provided."  *Hankins v. The Gap, Inc.*, 84 F.3d 797, 800–01 (6th Cir. 1996); *see also Bertrand v. City of Mackinac Island*, 662 N.W.2d 77, 84 (Mich. Ct. App. 2003).  Whether a requested accommodation is reasonable in light of potential alternatives is a "highly fact-specific" determination.  *See Groner v. Golden Gate Gardens Apartments*, 250 F.3d 1039, 1044 (6th Cir. 2001) (citation omitted).

The evidence, especially viewed in the light most favorable to Poplar, shows that none of the other accommodations were reasonable alternatives to Poplar's request for an assistant.  The earlier accommodations—like the larger computer screen and dimmer lights—were provided around the time that Poplar started work at the Commission, long before her May 2018 medical appointment where her doctor advised that her "severe eye pain" stemmed from the number of hours she spent reading and working on the computer.  It was after that appointment that she formally requested an HR Assistant to help her with those tasks.  Thus, evidence shows that the previously provided larger computer monitor and dimmer lighting were not adequately accommodating her disability.

Further, although some testimony suggested that Pearson continued to accommodate Poplar after her promotion, contrary evidence showed the opposite.  For instance, during

Dellaposta's testimony, plaintiff's counsel walked him through a comparison between the job descriptions for the HR Assistant and Benefits Coordinator roles, and Dellaposta acknowledged that the HR Assistant's duties specific to accommodating Poplar were absent from the Benefits Coordinator's job description.

Pearson herself testified that, although she continues to do some tasks for Poplar, her new role does not encompass helping with reading and computer work as an accommodation for Poplar's disability. She explained that 60% of her previous job as HR Assistant was spent directly assisting Poplar. But once she was promoted to Benefits Coordinator, she could not dedicate as much time to helping her, instead assisting for only 30–60 minutes a day.

On this evidence, it was appropriate for the jury, not the court, to make the "highly fact-specific" determination of whether the requested accommodation was reasonable considering the purported alternatives. *See id.*

## C.

The Commission's final argument that it was entitled to judgment on the failure-to-accommodate claim arises from an error the district court made in its order on summary judgment. Recall that § 37.1210(18)'s timely-written-notice requirement applies only if the employer "post[s] notices" to notify employees of that requirement. Mich. Comp. Laws § 37.1210(19). In its order on the Commission's motion for summary judgment, the district court relied on that posted-notice requirement to deny the Commission summary judgment. Specifically, it held:

> [A] defendant invoking the notice provision under subsection 18 "*must first* post notices or use other appropriate means to provide all employees and job applicants with notice of the requirements of subsection (18)". MCL 37.1210(19). It is not clear that [the Commission] did this.

> Since neither party presents evidence of compliance with the standard set out in MCL 37.1210 (18) and (19), the Court finds summary judgment on these grounds would be inappropriate.

The district court misquoted the statute—subsection (19) does not contain the words "must first." *See* Mich. Comp. Laws § 37.1210(19). And those misquoted words were apparently important to the district court's reasoning because the court chose to italicize them.

The Commission argues that this error was consequential. It first cites *London v. American Hearing Centers, Inc.*, 2004 WL 2124626, at *3 (Mich. Ct. App. Sept. 23, 2004) (per curiam), for the proposition that it is the plaintiff's burden "to show that defendant failed to comply with § 210(19) if she wished to proceed with her disability claim." It next asserts that the district court's interpretation of "nonexistent language" in § 37.1210(19) resulted in the court erroneously placing that burden on the Commission. Had the district court not done so, the Commission concludes, the Commission would have won summary judgment on the failure-to-accommodate claim.

But that conclusion does not follow from the premises. True, the district court erred by misquoting the statute, and it is unclear which party bears the burden to show compliance or lack thereof with § 37.1210(19)'s posted-notice requirement. *Compare* Mich. Comp. Laws § 37.1210(1) ("In an action brought pursuant to this article for a failure to accommodate, the person with a disability shall bear the burden of proof."), *and London*, 2004 WL 2124626, at *3, *with Weber v. Infinity Broad. Corp.*, 2005 WL 3726303, at *3 (E.D. Mich. Dec. 14, 2005) ("There is no indication that defendants complied with subsection 19 in this case."). But even assuming the Commission posted the required notices, that fact alone would not have entitled the Commission to summary judgment; it instead would have begged the next question of whether Poplar gave timely written notice.

And for that question, as explained above, there was sufficient evidence for the jury to reasonably find that—and thus to create a genuine dispute of material fact about whether—Poplar gave timely written notice. *See White*, 364 F.3d at 794. Thus, regardless of the misquotation, the

Commission was not entitled to summary judgment on this claim, so the error was harmless. *See* Fed. R. Civ. P. 61.

D.

For these reasons, the Commission was not entitled to judgment as a matter of law or summary judgment on Poplar's failure-to-accommodate claim.

III.

Next, the Commission argues that the district court erred in denying its motion for a new trial. It asserts that it was entitled to a new trial for four reasons: (1) the jury's verdict was against the great weight of the evidence, (2) the jury instructions and verdict form were erroneous and prejudicial, (3) the district court admitted unfairly prejudicial testimony, and (4) the damages award was excessive. On that last ground, the Commission alternatively seeks remittitur of damages.

The district court should grant a new trial if the jury reached a "seriously erroneous result," as evidenced by: "(1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the trial being unfair to the moving party in some fashion, *i.e.*, the proceedings being influenced by prejudice or bias." *Caudill Seed & Warehouse Co. v. Jarrow Formulas, Inc.*, 53 F.4th 368, 379 (6th Cir. 2022) (per curiam) (citation omitted); *see also* Fed. R. Civ. P. 59(a)(1). We review the district court's denial of a new trial for an abuse of discretion. *Caudill Seed*, 53 F.4th at 379.

A.

The Commission first argues it was entitled to a new trial because the jury's verdict on both the failure-to-accommodate and retaliation claims was against the great weight of the evidence. To evaluate the Commission's argument, we view "the evidence in the light most

favorable to the prevailing party." *See Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 865 F.2d 761, 767 (6th Cir. 1989) (per curiam) (citation omitted). And when presented with conflicting evidence, we leave credibility determinations to the jury. *See Wheeler v. McKinley Enters.*, 937 F.2d 1158, 1162 (6th Cir. 1991). This ground does not warrant a new trial if the verdict was reasonable. *See Cranpark, Inc. v. Rogers Grp., Inc.*, 821 F.3d 723, 737 (6th Cir. 2016).

For the failure-to-accommodate claim, the Commission makes no independent arguments about why the verdict was against the great weight of the evidence; instead, it merely relies on "those reasons already argued above." Even putting aside that this argument is likely forfeited, *see United States v. Huntington Nat'l Bank*, 574 F.3d 329, 332 (6th Cir. 2009), because we already determined on de novo review that the Commission was not entitled to judgment as a matter of law on the failure-to-accommodate claim, the district court did not abuse its discretion in deciding that the jury's verdict on that claim was not against the great weight of the evidence.

As for the retaliation claims, the Commission argues that there was a lack of evidence to support the element of but-for causation between Poplar's protected activity (her assertion of EEOC charges and internal complaints against the Commission and Peivandi) and the adverse actions taken against her (her two-week, unpaid suspension in August 2021 and the Commission's failure to backfill the HR Assistant position after promoting Pearson).

As part of a retaliation claim, a plaintiff must prove "a causal connection between the protected activity and the adverse employment action." *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008) (citation omitted). How strong that causal connection must be depends on which statute forms the basis of the retaliation claim. *See, e.g.*, *id.* at 527–28 (outlining the causation standard under Michigan's Elliott-Larsen Civil Rights Act). Recall that Poplar's retaliation claims arise under Title VII; 42 U.S.C. § 1981; Michigan's Elliott-Larsen Civil Rights

Act; and Michigan's Persons with Disabilities Civil Rights Act. Among those laws, Title VII has the strictest causation standard, requiring "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Thus, we focus on whether Poplar cleared that highest hurdle: whether there was sufficient evidence for a jury to find that Poplar's complaints were the but-for cause of the adverse actions.

"Whether protected activity was the but-for cause of an adverse employment action depends upon the context in which that action occurs." *Kenney v. Aspen Techs., Inc.*, 965 F.3d 443, 448 (6th Cir. 2020). But-for causation may be shown with temporal proximity combined with other indicia of retaliatory conduct. *See id.*; *see also Randolph v. Ohio Dep't of Youth Servs.*, 453 F.3d 724, 737 (6th Cir. 2006).

For two primary reasons, the evidence—viewed in the light most favorable to Poplar— permitted the jury to find but-for causation. First, the protected activities and the adverse actions were close in time. Throughout 2021, Poplar engaged in activities that the Commission concedes were protected. Those activities included Poplar's filing of (1) the January 2021 internal complaint, (2) the May 2021 EEOC charge, and (3) the August 2021 internal complaint. Peivandi suspended Poplar in August 2021 after she filed the first two complaints. And Peivandi decided to promote Pearson during Poplar's suspension and administrative leave between August and November 2021—when she filed the third complaint. Then, after Poplar returned to work, the Commission never filled that position, despite Poplar's repeated requests to do so.

Second, that temporal evidence was bolstered by indicia of Peivandi's retaliatory conduct. Peivandi testified that he was upset about Poplar's January 2021 complaint, in which Poplar alleged that she "feared being subjected to reprisal by . . . Peivandi." He further testified that,

because of that complaint, he proceeded to issue a series of "directives" to Poplar as "corrective action," to ensure that she understood "who the boss was" at the Commission. Then, after Poplar distributed a memorandum that Peivandi had not approved—in contravention of his directives— he placed her on the two-week, unpaid, disciplinary suspension, during which she filed the August 2021 complaint. And when Poplar returned to work, she discovered that her assistant had been promoted. That position remained unfilled because Peivandi "did not want to" fill it. Such evidence, viewed in the light most favorable to Poplar, suffices to show but-for causation—that the adverse actions would not have taken place had Poplar not made her complaints. *See Randolph*, 453 F.3d at 737.

The Commission resists this conclusion by arguing that the decision not to hire an HR Assistant was independent of retaliatory animus. In support, it cites evidence that Peivandi had long believed—since "before Poplar engaged in protected activity at all"—that a full-time HR Assistant was unnecessary. But that argument ignores that the Commission provided an HR Assistant for Poplar for over two years, despite Peivandi's objections and while he was the Managing Director. It was only after Poplar filed her complaints that Peivandi promoted Pearson and refused to hire a new HR Assistant, even when the Commission had budgeted for that position.

Accordingly, the district court did not abuse its discretion in determining that the jury verdict on the failure-to-accommodate and retaliation claims was not against the great weight of the evidence.

### B.

The Commission next argues that it is entitled to a new trial because of problems with the verdict form and jury instructions. "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or

give an inadequate understanding of the law." *Wesley v. Campbell*, 864 F.3d 433, 441 (6th Cir. 2017) (citation omitted). A district court does not abuse its discretion in crafting jury instructions unless the instruction "fails accurately to reflect the law" or "if the instructions, viewed as a whole, were confusing, misleading, or prejudicial." *Monroe v. FTS USA, LLC*, 860 F.3d 389, 413 (6th Cir. 2017) (citation omitted).

1.

First, the Commission complains that the district court adopted a verdict form for the failure-to-accommodate claim that omitted its proposed interrogatory about whether Poplar gave timely written notice. As the district court explained in its order denying the motion for a new trial, it determined that the omission of an interrogatory about the timely-written-notice requirement was appropriate because the instructions elsewhere explained that requirement's importance.

The district court did not abuse its discretion by omitting the interrogatory. The verdict form—under the header for failure-to-accommodate liability—listed two stipulations and asked the jury a single yes-or-no question: "Did the [Commission] fail to provide a reasonable accommodation to Ms. Poplar?" The jury instructions, which we construe as a whole with the verdict form, *see Wesley*, 864 F.3d at 441, explained that a failure-to-accommodate claim requires that the disabled person "notified her employer in writing of her need for accommodation within 182 days after she knew the accommodation was needed." And "[w]e generally must assume that the jury followed the district court's instructions." *Monroe*, 860 F.3d at 413.

Thus, under those instructions, if the jury found a lack of timely written notice, it presumably would have expressed that finding by responding "no" to the question about failure-to-accommodate liability. Indeed, the Commission told the jury to follow that very procedure in

its closing argument, referencing the notice instruction and verdict form. By the same token, we presume that the jury's "yes" response meant that it found that Poplar provided the Commission with timely written notice.

The Commission insists that presumption is misplaced because the verdict form made it difficult for the jury to express a finding about timely written notice. As the Commission asserts, the omission of an interrogatory on notice made it unlikely "that the jury deliberated or made any determination on this element of the claim at all." Yet mere speculation about the jury's deliberations cannot overcome the presumption that the jury followed all instructions. *See id.* While we see the Commission's point that adding the interrogatory might have made the form more user friendly, its omission did not render the instructions and verdict form "confusing, misleading, or prejudicial." *See id.* (citation omitted). Thus, the district court did not abuse its discretion by omitting that interrogatory from the verdict form.

2.

Next, the Commission complains that the district court adopted Poplar's version of the instruction about the elements for the failure-to-accommodate claim. The Commission asserts that this instruction was erroneous because it lacked information about certain legal principles related to an employer's duty to accommodate.

Because the Commission did not object to this instruction before the district court, we review this issue for plain error. Fed. R. Civ. P. 51(d)(2). "Plain error is an obvious and prejudicial error that requires action by the reviewing court in the interests of justice." *Reynolds v. Green*, 184 F.3d 589, 594 (6th Cir. 1999) (citation modified). Such errors arise in the context of jury instructions when the instructions are "hopelessly confusing" or "fail to provide even the barest legal guideposts to aid the jury in rationally reaching a decision." *Id.* (citation modified).

The Commission again fails to account for how the instructions "as a whole" presented the law to the jury. *See Wesley*, 864 F.3d at 441 (citation omitted). Although the instruction specific to the failure-to-accommodate elements did not detail applicable legal principles, others did. The instructions defined key legal terms like reasonable accommodation and undue hardship, explaining that the latter is a defense against the failure-to-accommodate claim. Indeed, the Commission's closing argument addressed those legal principles that it believed were important to an employer's duty to accommodate, referencing the applicable instructions. There is no evidence that the instructions "fail[ed] accurately to reflect the law," *Monroe*, 860 F.3d at 413 (citation omitted), let alone that they were "hopelessly confusing" or "fail[ed] to provide even the barest legal guideposts," *Reynolds*, 184 F.3d at 594 (citation modified). Thus, the instruction about the failure-to-accommodate elements was not plainly erroneous.

C.

Next, the Commission complains of unfairly prejudicial testimony that the district court admitted allegedly in violation of a prior evidentiary ruling. After the district court dismissed Poplar's race-discrimination claims (leaving only the failure-to-accommodate and retaliation claims), the Commission moved in limine to exclude evidence of race discrimination or harassment. The district court granted that motion. Despite that ruling, the Commission asserts, the district court later allowed former Board commissioner Cloyce Dickerson to "falsely testif[y] that Peivandi was a racist who had nearly a dozen prior harassment lawsuits against him." Dickerson's trial testimony contained many references to discrimination and harassment, such as accusing Peivandi of giving "two African-American directors less money than" their white peers, proposing an organization chart that was "racially motivated," attempting to "take black leadership

positions" away from the Commission, having "about 10 lawsuits filed against him," and "ha[ving] a problem with women and black people."

Regardless of whether the district court violated a pretrial evidentiary ruling, to obtain a new trial, the Commission must show that the admission of Dickerson's testimony rendered the proceedings "unfair" because they were "influenced by prejudice or bias." *See Caudill Seed*, 53 F.4th at 379; *see also Black v. Shultz*, 530 F.3d 702, 706 (8th Cir. 2008) ("A violation of an order granting a motion in limine" entitles a party to a new trial "only where the violation constitutes prejudicial error or results in the denial of a fair trial."). The Commission fails to do so for at least three reasons.

First, the Commission did not contemporaneously object to the complained-of testimony at trial, thus "raising the degree of prejudice required to demonstrate the appropriateness of a new trial." *Mosby-Meachem v. Memphis Light, Gas & Water Div.*, 883 F.3d 595, 607 (6th Cir. 2018). Indeed, it was the district court that first raised the concern of whether "a curative instruction on the race discrimination issue" was warranted after Dickerson's "off the chart" testimony.

Second, "a motion for a new trial should be denied when any prejudice that might have resulted from the error was cured by instructions from the court." *Smith v. Rock-Tenn Servs., Inc.*, 813 F.3d 298, 315 (6th Cir. 2016) (holding that "[a] few improper stray comments are not sufficient to warrant a new trial, especially when the district court issued a curative instruction"). Here, the district court gave instructions to cure any prejudice that might have arisen from Dickerson's testimony, at both the beginning and the end of trial. At the outset, the district court instructed the jury that the trial concerned only two types of claims: retaliation for filing complaints and failure to accommodate a disability. It told the jury that "Poplar does not have any remaining claims that

she was subject to race or disability discrimination." Then, at the close of evidence, the district court gave the following curative instruction:

> Plaintiff Donna Poplar no longer has in this lawsuit any remaining claims that she was subject to discrimination or harassment on the basis of race or any other protected characteristic. Therefore, any statements regarding alleged race discrimination or harassment that may have come up at trial cannot be used to determine whether Ms. Poplar proved her retaliation and failure to accommodate claims by a preponderance of the evidence. *To the extent evidence of race discrimination or harassment was raised at trial, or to the extent any witness gave testimony concerning race discrimination or harassment, you must not let it influence or affect the way you evaluate Ms. Poplar's remaining claims.*

(Emphasis Added). Together, those instructions ameliorated any prejudice that might have arisen from Dickerson's testimony.

Third, the sheer volume of evidence and number of witnesses lessens the probability that Dickerson's testimony alone influenced the jury in a way that was unfair or prejudicial. During the eight-day trial, the jury heard testimony from 17 witnesses. "[E]specially when the district court issued a curative instruction," the Commission fails to prove that "[a] few improper stray comments"—by a single witness out of many—"warrant a new trial." *See Smith*, 813 F.3d at 315.

Moreover, the Commission's additional argument that it is entitled to a new trial because the district court declined to take judicial notice of the lack of lawsuits against Peivandi is a non-starter. The Commission cites no authority showing that a lack of lawsuits against someone—as ascertained by counsel's limited research of court records—is even the type of fact that the district court could properly take judicial notice of, let alone that the court's declination to take such notice amounts to prejudicial error. *See* Fed. R. Evid. 201(b). What is more, the Commission cross-examined Dickerson on the lawsuit accusations and then argued in closing that his testimony was "untrue" and "utterly unsupported by any record evidence because those lawsuits don't exist." The

jury could fairly weigh the evidence (or lack thereof) before it. Thus, the district court did not abuse its discretion by denying the motion for a new trial on this ground.

D.

Finally, the Commission argues that it is entitled to either a new damages-phase trial or remittitur because of the size of the jury's noneconomic-damages award. The district court denied the Commission's motions for remittitur or a new damages-phase trial, and we apply the same "abuse-of-discretion review to the denial of either motion." *Gibson v. Moskowitz*, 523 F.3d 657, 663 (6th Cir. 2008). Remittitur or a new damages trial is appropriate only if "a jury's award is: 1) beyond the range supported by proof; 2) so excessive as to shock the conscience; or 3) the result of mistake." *See Szeinbach v. Ohio State Univ.*, 820 F.3d 814, 820 (6th Cir. 2016) (citation modified). Accordingly, we will reverse the district court's application of that standard only if "we have 'a definite and firm conviction' that the district court made a clear error of judgment" in applying it. *Id.* (citation omitted). Moreover, our "review of a jury's damage award is extremely deferential, and we will not order a remittitur or a new trial unless the award is contrary to all reason." *Cranpark*, 821 F.3d at 739 (citation modified).

Recall that the total jury award was $800,000. The lion's share, $753,000, was for noneconomic damages ($350,000 for retaliation and $403,000 for failure to accommodate). The Commission argues that the noneconomic-damages award is beyond the range supportable by proof. *See Szeinbach*, 820 F.3d at 820.

We disagree. Poplar provided extensive testimony about her mental and emotional struggles stemming from the Commission's retaliation and failure to accommodate her disability. As she explained, she worked for months without assistance, which strained her eyes and put her remaining vision at risk. She feared that Peivandi and the Commission, by not filling the HR

Assistant position, were trying to force her to quit. And she testified that—because of the Commission's actions—she became anxious and depressed, she "lost interest in doing everything that [she] enjoyed doing," and she felt "ashamed" because she thought that people saw her as "weak" at her job.

Other witnesses bolstered that testimony. For instance, Poplar's primary-care physician and treating psychiatrist both testified that Poplar was diagnosed with generalized anxiety, major depressive disorder, and post-traumatic stress disorder, all related to her stress from work. Poplar's mental-health issues were so severe that her psychiatrist—who has over 50 years of experience and who deemed Poplar to be "very credible" in her sessions with him—recommended that she take medical leave from work. Further, Poplar's former pastor—a licensed social worker who conducts mental-health screenings for the United States Navy—also testified about Poplar's mental-health symptoms. He explained that he has worked with Poplar as a counselor for many years and that, several years after she started her job at the Commission (around the time of the retaliation and failure to accommodate at issue here), he noticed changes in her, including signs of depression, anxiety, and features associated with panic attacks.

The Commission offers no evidence to rebut this evidence of mental and emotional harm. Instead, it asserts that $753,000 in noneconomic damages is too high for mental-health-related harm because that figure is 94% of the $800,000 total. But that fact alone does not warrant remittitur or a new trial. For instance, in *Miller v. Alldata Corp.*, 14 F. App'x 457, 458, 466–67 (6th Cir. 2001), we affirmed a denial of a motion for remittitur where noneconomic damages for emotional harm made up about 95% of the total damages awarded for gender discrimination.

Although the Commission argues that we should contrast Poplar's award with more "typical[]" awards in other cases with similar claims, both we and the Michigan Supreme Court

have cautioned against relying on past awards to find damages excessive. *See Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 906 (6th Cir. 2004) (noting that "[e]ndeavoring to compare awards is difficult and often unfruitful, because the factual circumstances of each case differ so widely and because it places reviewing courts in the position of making awkward assessments of pain and suffering better left to a jury"); *Precopio v. City of Detroit, Dep't of Transp.*, 330 N.W.2d 802, 808 (Mich. 1982) (stating that courts "should not attempt to reconcile widely varied past awards for analogous injuries" when evaluating an award for pain and suffering). Thus, the district court did not abuse its discretion in denying the motions for remittitur or a new damages-phase trial.

## E.

For these reasons, the Commission was not entitled to a new trial or remittitur.

## IV.

We affirm the district court's judgment.